## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br>100 F Street NE<br>Washington, DC 20549,<br><br>        Plaintiff,<br><br>v.<br><br>CRYSTAL WORLD HOLDINGS, INC.<br>1701 Pennsylvania Ave NW Ste. 300<br>Washington, DC 20006<br>(202) 294-5308,<br><br>THE NEW SPORTS ECONOMY INSTITUTE<br>833 N. Garfield Avenue<br>Pasadena, CA 91104<br>(202) 294-5308,<br><br>and<br><br>CHRISTOPHER PAUL RABALAIS<br>833 N. Garfield Avenue<br>Pasadena, CA 91104<br>(202) 294-5308<br><br>        Defendants, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL NO. 1:19-cv-2490<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges:

## I.   INTRODUCTION

1.      The Commission brings this action to enjoin Defendants Crystal World Holdings,

Inc. ("CWH"), The New Sports Economy Institute ("NSEI") and Christopher Paul Rabalais

("Rabalais") from violating the registration and antifraud provisions of the federal securities laws.

From no later than July 2014 through at least April 2019, Defendants raised almost $1.5 million

from hundreds of individuals in the United States and across the world through the unregistered offer and sale of securities in CWH.   In addition, in the offer and sale of those securities, Defendants also made material misrepresentations and engaged in practices which operated as a deceit upon the purchasers of the securities.

2.       Rabalais, through CWH and NSEI, sold unregistered shares of CWH stock to the public without a valid exemption from registration.  Rabalais described the payments by investors for CWH shares as "donations" to NSEI, a nonprofit entity he formed and controlled.  He told investors the CWH shares were "gifts" granted in exchange for those "donations."

3.       Rabalais touted at various times that CWH stock was about to be registered with the Commission and stressed the importance of buying the stock before registration made it valuable.  These solicitation statements were materially false and misleading because Defendants never took any steps to register CWH shares with the Commission.

4.       As a result of the conduct alleged in this Complaint, Defendants violated Sections 5 and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e and 77q(a).  Unless restrained and enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

5.       The Commission therefore respectfully requests the Court enter: (i) a permanent injunction restraining and enjoining Defendants from violating the federal securities laws; (ii) a permanent injunction restraining and enjoining Defendants from engaging in certain further conduct; (iii) an order directing Defendants to pay disgorgement with prejudgment interest on a joint and several basis; and (iv) an order directing Defendants to pay civil money penalties.

II.   **DEFENDANTS**

6.      CWH is a Wyoming corporation organized by Rabalais in 2014 with its principal office located in Washington, DC.  CWH is the holding company and owner of all intellectual property related to the experimental sports marketplace website platform known as AllSportsMarket ("ASM") and found at www.allsportsmarket.com.  ASM describes itself as "an experimental marketplace" that allows individuals to "buy & sell shares of your favorite sports teams in a 24-hour, worldwide marketplace" and "earn money when your stocks perform well." ASM was founded by Rabalais in hopes of making "sports an asset class."  His stated goal was for ASM to become a regulated exchange and the platform for the offer of sports trading instruments to the investing public.

7.      NSEI is a Texas 501(c)(3) non-profit corporation organized by Rabalais in 2011 with its principal office located in Pasadena, CA.  NSEI operates the ASM platform pursuant to a royalty-free intellectual property licensing agreement with CWH.

8.      Rabalais, age 49, is a resident of Pasadena, CA and Humble, TX, and the founder, president, principal, managing member, managing director and/or general partner of CWH and NSEI.  During the relevant time period, Rabalais directed or controlled the business activities and affairs of CWH and NSEI, using both companies' offices and financial accounts in connection with the transactions described herein, and both companies functioned as his *alter ego*.

III.   **JURISDICTION AND VENUE**

9.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and Sections 20(b), 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a).

10.     The Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and 28 U.S.C. § 1391, because, among other things, some or all of the acts and transactions in which Defendants engaged and that constitute violations of the federal securities laws occurred in this District, and because CWH maintains its principal office in this District.

11.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange.

## IV.     FACTUAL BACKGROUND

### A.     Defendants Issue Unregistered Shares of CWH Stock

12.     Between July 2014 and April 2019, Rabalais, through CWH and NSEI, publicly offered and sold at least 4,800 unregistered common and preferred share certificates of CWH to investors in the United States, Canada, Europe, and Australia.  The shares were marketed through various "solicitation program" emails.  Rabalais authored these emails and sent them to mailing lists compiled from individuals who had registered on the NSEI website, previously made payments to NSEI for other programs, and/or previously received CWH shares.  The texts of these solicitation emails also were posted publicly on the NSEI website and on the community forum of the ASM website, both of which were accessible to NSEI and ASM members.

13.     Rabalais sent the solicitation emails in his dual role as managing director of NSEI and president and director of CWH, using an email address with an email domain associated with NSEI.  The solicitation emails were marked as copyrighted by CWH and included CWH's principal mailing address in Washington, DC.

14.     Rabalais' pattern was to release one of these program solicitations when he needed funding to operate the ASM platform and NSEI.

15.     In the solicitation emails, Rabalais consistently and misleadingly described CWH shares as "gifts" issued in exchange for "donations" of money to NSEI when, in reality, the transactions constituted sales of unregistered securities for value based on offers by the Defendants without a valid exemption from registration.

16.     The CWH shares were securities.  Rabalais viewed CWH shares as traditional stock and as equity interests that would have real value when the ASM platform became a regulated stock market.  Rabalais planned to allow for transferability of CWH shares once the shares were registered with the Commission and intended to grant voting rights to preferred shareholders at some point in the future.

17.     At no point during the time period that Defendants offered and sold CWH shares using this gift-donation model, however, did they register the shares with the Commission or file offering documents; no registration statement was filed or in effect as to the shares; and no valid exemption from registration was available.  Indeed, Defendants offered and sold the shares to unaccredited investors across the United States and around the world, and Defendants had no mechanism or process in place to evaluate prospective investors or determine whether those investors qualified as accredited.

18.     Investors purchased their CWH shares via the internet, with payments made primarily to PayPal accounts in the names of NSEI and CWH.  These PayPal accounts were owned and controlled exclusively by Rabalais.  Between July 2014 and March 2019, these accounts received at least $1,321,818, which corresponded to the issuance of at least 87,292,710 common shares and 143,068,510 preferred shares of CWH shares.  Rabalais was the sole recipient of the

funds paid through these accounts, and furthermore, he controlled the U.S. bank accounts to which these PayPal funds were often moved.

19.     Between July 2014 and March 2019, Rabalais also separately received payments of at least $122,363 directly to U.S. bank accounts that he controlled, which corresponded to the issuance of 5,388,000 common CWH shares and 101,147,188 preferred CWH shares.  During this same time period, Rabalais further received additional payments of approximately $26,900 through a Google Pay account that he controlled, which corresponded to the issuance of approximately 270,000 CWH shares.

20.     In April 2019, Defendants issued approximately 763,300 additional CWH shares using the same solicitation methodology described herein.  On information and belief, Defendants received additional funds from investors for these shares.

### B.     Defendants' Material Misrepresentations Regarding CWH Stock

21.     At various times between July 2014 and April 2019, to induce investors to participate in the share offerings and purchase CWH stock, Rabalais falsely touted the CWH shares were about to be registered with the Commission, stressing the importance of buying the stock before registration made it valuable.

22.     For example, a June 2017 program solicitation email, prominently bearing the official Commission seal (without authorization from the Commission), stressed the importance of making a donation and obtaining shares as soon as possible: "This weekend we will finalize the shareholder registry in preparation for submission to the S.E.C. as required by law and this is the last shot at FREE PREFERRED SHARES."  The program offer included 25,000 "free" common shares in CWH and 5,000 "free" preferred shares.  Other emails concerning the same program established that these were offered in exchange for a "donation" of $250.

23.     In addition to the solicitation program emails, in most of the cover emails he sent to purchasers when transmitting their CWH share certificates, Rabalais promised registration of the CWH shares.  Rabalais also directly told individual CWH shareholders at various points throughout the relevant time period, often in response to questions about the value and transferability of the CWH shares, that registration was happening soon.  Rabalais used an email domain associated with NSEI when sending these transmittal emails.

24.     The supposed registration of CWH stock was especially important because Rabalais consistently instructed CWH shareholders that their shares could not be transferred and had to be held by the initial recipient until registration occurred.

25.     The following chart summarizes the written misrepresentations Rabalais made directly, or through NSEI and CWH, to then-current and prospective CWH shareholders:

| Date | Statement |
|---|---|
| 9/1/2014 to 12/2016 | "When I receive [your email confirmation], your shares will be recorded in the official stock database that will be used to register your shares with the Securities and Exchange Commission." |
| 9/14/2014 | "No transfers allowed at this point.  That must happen after S.E.C. registration sometime next year." |
| 10/3/2014 | "At this point, shares can only move from the treasury to the proper owner.  You will be able to gift shares once they are registered with the S.E.C., which is scheduled for some time in 2015." |
| 9/13/2015 | "We will register the stockholders with the S.E.C. once this process is done.  I'll look to do this early 2016 after we close the claims." |
| 10/7/2015 | "There is no imminent IPO.  We will be registering the stock with the S.E.C. next year." |
| 10/25/2015 | "In early 2016, we will register the holding company stock with the S.E.C.  This is the first step to prepare a liquidity vehicle (private market first) for out [sic] stockholders." |
| 10/27/2015 | "We've been carefully putting everything in order so that our company stock can be registered with the S.E.C. early next year." |
| 4/27/2017 | "Have you ever had a missed opportunity in your life? . . . The lesson here is that you can't put things off anymore . . . About 97% of the direct holdings via common and preferred stock are gone . . .  If you know someone who might be interested, this is their last chance before we lock the shareholder registry." |

| Date | Statement |
|------|-----------|
| 6/30/2017 | "This weekend we will finalize the shareholder registry in preparation for the submission to the S.E.C. as required by law and this is the last shot at FREE PREFERRED SHARES." [The SEC's official seal was displayed alongside this statement.] |
| 10/6/2017 | "You sell your stock once it is registered with the SEC (expected in a year or less)." |

26.     These representations and written statements concerning the registration of CWH stock were false and misleading. Defendants never took any steps during the relevant time period to register the CWH shares, and as alleged above, the shares were never registered with the Commission. Moreover, by April 2017, Rabalais still did not even know how to register securities with the Commission, writing in an email to another CWH investor: "[w]e need to find out the process of registering the shares."

27.     Rabalais should have known that his statements about registering securities with the Commission, and the timeline for doing so, were misleading since he did not have an understanding as to how such registration was achieved.

**C.     Defendants Deceive Investors as to the Nature of their Investment**

28.     The gift-donation model employed by Defendants presented a false appearance of fact regarding the CWH share offering. Rabalais told investors they were receiving a gift in exchange for a charitable donation, rather than purchasing unregistered securities. The purchasers were not told that registration of the stock was necessary to comply with the securities laws. Rabalais should have known that structuring the CWH stock offering to appear as charitable donations could mislead investors.

29.     Rabalais furthered the false appearance of fact regarding CWH share registration by including the Commission's seal in his June 30, 2017 solicitation email which gave the misleading impression to prospective investors that the Commission was actively engaged with

Rabalais and had approved his actions.  Rabalais should have known that no such engagement or approval had been obtained.

30.     Rabalais also drafted or approved language on the NSEI and ASM websites that conveyed and reinforced the misimpression that Defendants were engaged with the Commission. Since at least November 2017, the website of the ASM platform has stated that ASM and NSEI intend to "collaborate with the SEC and other regulatory agencies, as needed, through a continuous and transparent dialogue . . . ."  While Rabalais may have intended to engage in such a collaboration or "dialogue" with the Commission or Commission staff, to date, no such collaboration or dialogue has occurred with respect to the issuance of CWH shares.  Rabalais should have known at the time he disseminated the information that no such collaboration or dialogue had even been initiated.

31.     Rabalais' dissemination to investors and prospective investors of the material misstatements reflected on the chart above also presented a false appearance of fact.  At the time he made many of those statements, Rabalais did not know how to register the stock and had taken no action to do so.  At a minimum, he should have known how the registration process worked before making these representations to investors.  He also should have known that registration would not occur in the timeframe he stated.

32.     While Rabalais may have hoped to get the CWH stock registered at some point, he had no understanding of the registration process and had not taken any steps toward registration at the time many of those statements were disseminated, rendering the statements false and misleading.

## COUNT I

### Sale of Unregistered Securities in Violation of Sections 5(a) and 5(c) of the Securities Act

### (Against All Defendants)

33.     The Commission repeats and realleges Paragraphs 1 through 32 of its Complaint.

34.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions described in this Complaint and no exemption from registration exists with respect to these securities and transactions.

35.     Defendants directly or indirectly (a) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise; (b) carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; and (c) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise, any securities without a registration statement having been filed or being in effect with the Commission as to such securities.

36.     By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### Fraud in Violation of Section 17(a)(2) of the Securities Act

### (Against All Defendants)

37.     The Commission repeats and realleges Paragraphs 1 through 32 of its Complaint.

38.     Defendants, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly, recklessly or negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

39.     By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT III

### Fraud in Violation of Section 17(a)(3) of the Securities Act

**(Against All Defendants)**

40.     The Commission repeats and realleges Paragraphs 1 through 32 of its Complaint.

41.     Defendants, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly, recklessly or negligently engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon the purchasers and of such securities.

42.     By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

### RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find Defendants committed the violations charged, and enter Judgments:

## I.

### **Permanent Injunctions**

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from directly or indirectly violating the federal securities laws alleged in this Complaint; and further permanently restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from directly or indirectly, including, but not limited to, through any entity owned or controlled by any of them, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer, provided, however, that such injunction shall not prevent Rabalais from purchasing or selling securities for his own personal account or accounts that he controls.

## II.

### **Disgorgement**

Ordering Defendants to disgorge, with prejudgment interest, on a joint and several basis, all ill-gotten gains received as a result of the acts or courses of conduct alleged in this Complaint.

## III.

### **Penalties**

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

## IV.

### Further Relief

Granting such other and further relief as the Court determines to be necessary and appropriate.

## V.

### Retention of Jurisdiction

Further, the Commission respectfully requests the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

### JURY DEMAND

Plaintiff demands a trial by jury as to all claims so triable.


DATED:  August 19, 2019                    Respectfully submitted,

                                           SECURITIES AND EXCHANGE COMMISSION

                                           By:    /s/ Patrick R. Costello

                                                  Patrick R. Costello (Florida Bar No. 75034)
                                                  Attorney for Plaintiff
                                                  Securities and Exchange Commission
                                                  100 F Street NE
                                                  Washington, DC 20549-5949
                                                  Telephone: (202) 551-3982
                                                  Fax: (202) 772-9282
                                                  Email: costellop@sec.gov
                                                  *Appearing pursuant to LCvR 83.2(e)*

OF COUNSEL:

Melissa R. Hodgman *(Appearing pursuant to LCvR 83.2(e))*
Ivonia Slade *(Appearing pursuant to LCvR 83.2(e))*
Charles Davis (D.C. Bar No. 341438)
Michael Flanagan (D.C. Bar No. 985580)
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-5949