**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CRYSTAL WORLD HOLDINGS, INC.,<br>THE NEW SPORTS ECONOMY INSTITUTE, and<br>CHRISTOPHER PAUL RABALAIS<br><br>Defendants. | ) | Civ. No. 19-2490 (CJN)<br>Evidentiary Hearing and<br>Oral Argument Requested |

**AMENDED REPLY OF DEFENDANTS CRYSTAL WORLD HOLDINGS, INC. AND THE NEW SPORTS ECONOMY INSTITUTE TO PLAINTIFF'S MOTION FOR FINAL JUDGMENT**

Defendants Crystal World Holdings, Inc. ("CWH") and the New Sports Economy Institute, ("NSEI") (collectively, the "Defendants"), by their attorney, file this brief in response to Plaintiff Securities and Exchange Commission's ("SEC") *Motion for Final Judgment*.

## INTRODUCTION

The All Sports Market ("ASM") is a platform where people can trade virtual sports shares. It is intended to be a capital-generation mechanism for the sports industry. Sports leagues, like any other business, need capital. This need is particularly acute for the smaller sports leagues – those that do not have the market penetration or resources of leagues like the NFL, NBA, or MLB. Research conducted by Chad Deihl and Alper Ozgit, the two individuals who are currently most

involved with the operations of CWH and NSEI, revealed that 80 - 90% of start-up sports leagues fail, usually due to inadequate capitalization. ASM was developed in order to provide a means by which such leagues could generate much-needed income. Defendant Christopher Rabalais had the original idea for the platform, and Ace Underhill did the technical work needed to get the site up and running.

CWH is a for-profit corporation that owns all the IP and the ASM site. NSEI is a non-profit corporation which has been granted a royalty-free license by CWH to operate the platform. It was also intended that NSEI would engage in programs to promote financial literacy. Rabalais was CEO of CWH and Managing Director of NSEI until January 1, 2023, when Chad Deihl assumed both of those roles.[1] Since that date, Deihl has been the only representative authorized to speak on behalf of CWH and NSEI.[2] He does not receive any compensation for his work.[3]

When sports shares are traded on the ASM platform, the shareholders can earn dividends. The dividend pool is created when a sports league makes an initial sports offering ("ISO"). When a team wins, its shareholders receive a portion of the pool. Each trade also generates a commission, a portion of which is also added to the dividend pool.

Deihl first met Rabalais at a Super Bowl party in Hollywood that was hosted by ASM. That party was held around 2018, but Deihl is not sure of the date.[4] Since the time that Deihl was

---

[1] Deihl's official titles are CEO of CWH and Managing Director of NSEI. Deihl Deposition, p. 14.

[2] Deihl Deposition, pp. 13-14.

[3] Deihl Deposition, p. 26.

[4] Deihl Deposition, p. 19.

deposed, on July 25, 2023, his communications with Rabalais have been limited to emails concerning technical issues with the ASM website.[5] There was approximately one or two of those emails per month, and they generally involved a report of how many visitors had been on the site in the previous month.[6] Those matters are now being handled by Ace Underhill, who has been overseeing technical operations for CWH and NSEI, but is not paid for his work.[7] From July 2014 until April 2019, Rabalais was the sole officer and director of CWH.[8] He was still involved with the reporting on the ASM platform as of July 25, 2023 because the company had not yet identified a replacement.[9] Beginning on January 16, 2024, Deihl took over the tasks of inputting the data maintained on the site. Rabalais has not been involved with either company in any capacity since then.

During Rabalais's reign, CWH held all the IP associated with ASM. NSEI was the operator of the platform and also took in donation funds that were used to fund the business. NSEI was set up as a 501(c)(3) company, but lost that status when it failed to file tax returns and related documents on time. Deihl and Ozgit are hoping to have that status restored.

Under Rabalais, NSEI offered a "donation program". Interested individuals could make monetary donations for the benefit of NSEI. In exchange, the donors would receive "free equity shares" in CWH, often along with a basket of goods and/or services.

---

[5] Deihl Deposition, p. 20.

[6] *Ibid.*

[7] Deihl Deposition, pp. 22-3.

[8] *Ibid.*

[9] Deihl Deposition, p. 41.

The companies have not been able to raise any funding since this case was filed. Deihl and Ozgit have discussed some ideas that they hope to implement if the companies survive this proceeding. They intend to submit grant applications in the state of California. And they are working with the Ontario Securities Commission in Canada to determine the legal process in each of the ten provinces in the hopes of eventually doing business in that country.

If the companies do survive this litigation, Alper Ozgit would become the CEO of CWH. Ozgit is a tax consultant at PricewaterhouseCoopers.[10] He has worked there for 17 years. He earned a bachelor's degree in economics from a university in his home country of Turkey. He then attended UCLA, where he earned both a master's degree and a Ph.D. in economics. He retains Turkish citizenship, but is a permanent resident of the United States. He is married and has two children.[11]

Ozgit currently owns about 10% of the shares in CWH.[12] If he becomes the CEO, he plans to close NSEI as a separate entity. He believes that the mission of financial literacy can be served within the context of the for-profit company, and he believes that the accounting would be cleaner if there were just one corporation.[13] Although Ozgit has never held an official position with either CWH or NSEI, he has been a shareholder since 2008 and has offered informal advice at times. His "biggest feedback" to Rabalais was that

> the ASM products needs [sic] regulatory certainty. And, you know – and I have always believed that the SEC is the right regulatory agency for this type of product.

---

[10] Ozgit Deposition, p. 11.

[11] Ozgit Deposition, pp. 12-13.

[12] Ozgit Deposition, p. 23.

[13] Ozgit Deposition, pp. 30- 32.

> My opinion is the products that trade on the ASM platform would be characterized as securities. Therefore, it is extremely important that communication needs to happen with the SEC and regulatory certainty will be achieved before the company does anything with the product.

**THE SEC'S MISSTATEMENTS OF MATERIAL FACT**

Before the defendants can lay out their legal argument, they must correct the numerous misstatements of material fact in the SEC's brief. They will begin with the misstatements of fact contained in the *Memorandum of Points and Authorities* that accompanies the SEC's *Motion for Final Judgment.*

- "At the present time, despite having stepped down from his executive roles at CWH and NSEI, Rabalais has remained involved in running the ASM platform." (SEC brief, p. 4.)

This statement is inaccurate, and the SEC has reason to know that it is inaccurate. In support of this "fact", the SEC cites to paragraphs 120-122 of its *Appendix of Facts.* Those paragraphs, in turn, cite to several pages of Chad Deihl's deposition. That deposition was taken on July 25, 2023. At that time Deihl testified that Rabalais was still involved in running the technical end of the website and that, at that particular moment, there was no active search for a replacement. Ozgit's deposition was taken on July 26, 2023, and he was also asked about Rabalais's involvement with the website.

> Q. So he's [Rabalais] performing more of a technical oversight on the platform right now?
>
> A. Correct.
>
> Q. Is he planning – to your knowledge, is the plan for him to continue to do that indefinitely or is he going to stop doing that at some point?
>
> A. To my best knowledge, he's going to stop doing that.

> Q. Okay. When is he planning to stop doing that? Do you know?
>
> A. I think that at some point he made reference to December 31, 2023, so end of this year.[14]

Ozgit's timeline turned out to be accurate to within sixteen days. On January 16, 2024, counsel for the defendants sent an email to SEC counsel with the subject line, "ASM website". It stated in full:

> During the deposition of Chad Deihl, you expressed interest in knowing when Rabalais would no longer be involved in the operation of the website. That change took place today. Mr. Deihl has changed the logins and passwords, and Mr. Rabalais has not been informed of the new ones. Both the web domain and the website are now under Mr. Deihl's control. Ace Underhill will also be involved in the operation. Rabalais will not be playing any role moving forward.[15]

Two days later SEC counsel responded with an email that said, "Ok thanks Cheryl." Yet on February 21, 2024, the SEC filed a brief saying that "at the present time" Rabalais was still involved with the website. It did not acknowledge the updated information that it had received from the defendants.

- "CWH and NSEI have been actively discussing their future options and quest for investment capital, and have considered, among other things, simply bankrupting the companies and re-issuing the CWH equity shares all over again, morphing the ASM platform into another company owned by CWH's current CEO, or just moving the platform altogether on to [sic] a crypto blockchain." (SEC brief, p. 4.)

It is absolutely false that either Deihl or Ozgit has discussed plans to bankrupt the companies

---

[14] Ozgit Deposition, pp. 118-19.

[15] This email exchange is attached as Exhibit 3.

and re-issue shares of CWH. Neither of them wants to do that and they have not discussed taking such an action with each other – or anyone else. The only record source cited by the SEC in support of this statement is something said by Rabalais at his deposition. Deihl and Ozgit have not had any discussions about the future of the companies with Rabalais since he relinquished the CEO position on January 1, 2023. Rabalais is an unreliable source of information, as he was the one who resisted all the advice he received to register the securities being offered. He alone decided to flout the law by not registering the securities. He has every motive to try to place blame on other people involved with the defendant companies. Both Deihl and Ozgit have executed declarations stating that they do not want the companies to go bankrupt and that they have never discussed such a plan with anyone. Those declarations are attached as exhibits.[16]

Deihl and Ozgit jointly own a company called the New Finance Institute ("NFI"). When the SEC stated that the defendants "have considered . . . morphing the ASM platform into another company owned by CWH's current CEO," it was referring to NFI. That company exists for the sole purpose of hosting blogs that Deihl and Ozgit write. Those blogs focus on finance and the law. The two men hope eventually to sign up subscribers, but at the current time they have no paying customers. The SEC's statement that the defendant companies have been "actively discussing" – or, indeed, even considering – folding themselves into NFI has no support in the record. The entire discussion of a possible merger between CWH and NFI takes place at page 45 of Deihl's deposition:

> Q: Does the New Finance Institute have any involvement with the ASM platform?
>
> A: No, it does not.
>
> Q: Is it planning to at some point?

---

[16] Ozgit's Declaration is Exhibit 4; Deihl's is Exhibit 5.

> A: There are no plans for it, no. Not that something couldn't, you know, morph into that, but there are no plans for that.[17]

Deihl's answer is simply an anodyne acknowledgment that one never knows what the future may bring. The SEC's claim that a merger has been discussed or considered has no support in the record.

The third alternative that the companies are allegedly "considering" and/or "actively discussing," according to the SEC, is "moving the platform altogether on to [sic] a cryto blockchain." That statement is another mischaracterization of the record.

Immediately after testifying that he and Deihl were about to start the search for someone to take over running the website, Ozgit said: "We are looking at some of the block chain technologies and thinking about, you know, whether that might be a way to rely on from a platform perspective."[18] SEC counsel then asked, "You're planning on migrating the ASM platform to a crypto asset block chain?" Ozgit's answer:

> It has nothing to do with crypto, purely the technology side of it. There are no plans whatsoever around accepting crypto payments or anything – anything of the sort.
>
> It will be – if – even if he were to do this – and, again, this is just an alternative we're looking at. We have to talk to some developers and things like that.
>
> But I have – it is – my position is it would need to be U.S. dollars. Of course, when it becomes real money, right, it will be U.S. dollars and there would not be any crypto going through it. So just the underlying technology.[19]

Despite this clear statement from Ozgit that he is not even open to the idea of accepting cryptocurrency, the SEC persists in claiming that the defendants are actively considering migrating

---

[17] Deihl Deposition, p. 45.

[18] Ozgit Deposition, p. 119.

[19] Ozgit Deposition, p. 120.

to a crypto site.

The SEC may protest that these inaccuracies in its statement of the facts are minor and/or are reasonable interpretations of the testimony given by Deihl and Ozgit. The defendants would strongly dispute such a characterization. Taken in the aggregate, the SEC's factual claims seem intended to create a story that the companies are exploring ways to evade their responsibility to their shareholders and to continue to flout the laws that Rabalais flouted throughout his time as CEO. The reference to cryptocurrency appears to be an effort to besmirch the defendants by innuendo. Cryptocurrency is a prime enforcement target for the SEC. According to Cornerstone Research, there was a more than 50% increase in cryptocurrency- related enforcement actions from 2022 to 2023.[20] On March 23, 2023, the Commission issued a press release with the title *Exercise Caution with Crypto Asset Securities: Investor Alert.*[21] It begins this way:

> The SEC's Office of Investor Education and Advocacy continues to urge investors to be cautious if considering an investment involving crypto asset securities. Investments in crypto asset securities can be exceptionally volatile and speculative, and the platforms where investors buy, sell, borrow, or lend these securities may lack important protections for investors.

Despite Ozgit's unequivocal testimony that he would not be willing to open the ASM platform up to cryptocurrency, the SEC maintains in its brief that the companies are actively considering moving to a crypto blockchain site. It would appear that its purpose is to associate the defendants with a market that is rife with fraud and that poses a clear danger to the welfare of its investors.

The SEC's repeated attempts to suggest that Deihl and Ozgit want to drive the defendant

---

[20] https://www.cornerstone.com/insights/press-releases/sec-enforcement-of-cryptocurrency-reaches-a-new-high/.

[21] https://www.sec.gov/oiea/investor-alerts-and-bulletins/exercise-caution-crypto-asset-securities-investor-alert.

companies into bankruptcy are particularly upsetting in light of the fact that the defendants have made it clear throughout their dealings with the SEC that they last thing they want is to see CWH and NSEI go bankrupt. They have emphasized over and over again that, if the SEC would not agree to a total of disgorgement and penalties that could actually be paid, the companies would be driven into bankruptcy and all of the investors would be left out in the cold. When considered in the aggregate, the statements by the SEC listed above seem clearly intended to suggest that Rabalais is still involved in running the companies and that Deihl and Ozgit are engaged in a series of subterfuges to bankrupt both companies and wipe out all of the shareholders' investments. Both of those insinuations are false. As already discussed, Rabalais has had no role in either CWH or NSEI since January 1, 2023 – with the sole exception of doing some technical work on the ASM platform. That last, tenuous connection was permanently severed on January 16, 2024. Deihl and Ozgit have expended considerable time and money over the last five years to keep the companies from going bankrupt. They have also consistently expressed concern for the welfare of their investors. They continue to believe in the worth of the foundational idea behind CWH – *viz.,* opening a market for the trading of sports shares. And they are firmly committed to the ancillary educational goal of teaching the principles of financial literacy.

- "In addition, despite CWH's and NSEI's professed claims of having little to no current assets, the IP portfolio of the ASM platform is actually quite valuable, with trademarks and patents potentially worth millions, and with one of the larger shareholders, who is poised to become the majority shareholder, having valued CWH at north of $750,000." (SEC brief, p. 4.)

There are a few problems with this paragraph. Some of it is rank speculation. Some of it

mischaracterizes the evidence in the record. And some of it stands in direct opposition to statements made by the SEC in other sections of its brief. First, the claim by CWH and NSEI of having little to no current assets is absolutely true.[22] "Current assets" is a term of art. Ozgit, who holds a Ph.D. in economics, was using the term properly when he declared that the companies have no current assets. An asset is "a resource with economic value that an individual, corporation, or country owns or controls with the expectation that it will provide a future benefit." Assets are "classified as current, fixed, financial, and intangible." Current assets "are short-term economic resources that are expected to be converted into cash or consumed within one year. Current assets include cash and cash equivalents, accounts receivable, inventory, and various prepaid expenses."[23] It is pellucid that the defendants do not possess any current assets. The SEC's confusion appears to arise from its lack of understanding of this term of art.

The statement that the IP owned by ASM is "potentially worth millions" is nothing but rank speculation. The reason that there is no authority cited for this interesting statement is that none exists.

The larger shareholder "who is poised to become the majority shareholder" is a reference to Ozgit. The statement that he valued CWH at "north of $750,000" is untrue. Ozgit and Underhill had a conversation about Ozgit's possible interest in purchasing Underhill's shares. They did not reach

[22] It is clear that the SEC is saying that the companies' "professed claims of having little to no current assets" is a lie.

[23] https://www.investopedia.com/terms/a/asset.asp#:~:text=An%20asset%20is%20a%20resource,fixed%2C%20financial%2C%20and%20intangible.

any agreement because, as Ozgit explained, "the resolution of this case is a factor in the decision."[24] The two men discussed a possible valuation of $500,000 for CWH. There was no formal valuation undertaken. Ozgit testified that "Basically, I asked him would you be interested in selling 10 percent of your shares at $50,000." When pressed to explain how he arrived at that number, Ozgit stated: ". . . there is no, I guess, science behind that valuation. As I mentioned before, I do believe the company has good IP. . . . I do believe that's worth something. At the same time there's obviously this litigation matter, and the company also has some debts on the book and basically no assets. So I guess combining all these factors together, $500,000 was just a quantitative estimate I came up with." He then went on to say again that he could not make a final decision about such a deal before this litigation is resolved.[25]

SEC counsel then asked Ozgit how he would "go about valuing the company". His reply:

> How would I go about valuing the company? So traditionally the way valuations are done, as you may know, is it's a discounted cash flow, free cash flow exercise. So the valuation analyst would look at the projections of the company and revenues and costs and look at the cash flows and then assign a discount rate that measure the risk.
>
> And once you do that analysis, I guess the model will produce a valuation number. That's typically how valuations are done.
>
> The challenge in – with a company like this – is there is a lot of uncertainty with respect to the future because the product, in my opinion, needs regulatory approval And without that regulatory approval, there is no product and there are no revenues. So one would need to assign perhaps a probability estimate to regulatory approval and go about it like that. It can be done, but there are a lot of uncertainties, and it would be a very-hard-to-value type company.[26]

---

[24] Ozgit Deposition, p. 22.

[25] Ozgit Deposition, pp. 23-4.

[26] Ozgit Deposition, pp. 25-6.

SEC counsel then asked Ozgit whether he had followed the methodology he described before arriving at the $500,000 figure. He said that he had not.

> Q: So where did the $500,000 number come from if you didn't follow your own methodology?
>
> A: It was just a high-level number. Again, there is no valuation model that produced the 500 number. Obviously, Mr. Underhill will not sell me his shares at zero, right? And I don't think the company is particularly valuable right now.
>
> Its value is close to zero, in my opinion, at this moment. So $500,000 was basically my guess, around. I mean, this is a value perhaps with – somebody like Mr. Underhill might be willing to sell his shares and – this might be a value perhaps. Again, I have not made any final decision – I may be willing to buy it.[27]

In other words, Ozgit testified that he had been thinking of taking a flyer – offering Underhill an amount he might accept without knowing whether the company would survive the instant litigation. Perhaps it was foolish of him to think about taking such a risk, but that in no way supports the SEC's statement that Ozgit valued CWH at "north of $750,000". That is a clear misrepresentation of the record.

Despite Ozgit's repeated statements that he had not undertaken any formal valuation of the companies, the SEC kept pressing the point:

> Q. Mr. Ozgit, on the amplification response that you gave, the first one, about the $500,000 valuation pertaining to Mr. Underhill's shares, you described the methodology[28] that you used as being a range of prices, a range that the buyer and the seller would be interested in transacting at.
>
> As so if $500,000 is on a range, what is the high end of the range?
>
> A. I don't necessarily identify a high end, but let's call it between – I don't know – $250- and $750-. $500- would be at the midpoint of that range.

---

[27] Ozgit Deposition, pp. 26-7.

[28] In fact, Ozgit had specifically stated that he didn't use any "methodology".

> Q. And you and Mr. Underhill discussed that particular range?
>
> A. No, we did not.
>
> Q. Didn't you say that the buyer and the seller would have to be both cognizant of the amounts; otherwise, there would be no transaction, right?
>
> A. Yeah. Let me clarify. When I say buyer and seller, I wasn't necessarily referring to me and Mr. Underhill. I was just making a general reference to any buyer or any seller kind of coming together to make a transaction. So it was a general reference, not particular to me and Mr. Underhill.[29]

Ozgit was clear that he had never engaged in any valuation of the company; he had just come up with a number that he thought might interest Underhill. And, of course, no transaction was consummated. Ozgit did not buy any of Underhill's shares. Yet the SEC claims that he assigned a value "north of $750,000 to the companies", despite the fact that $750,00 was the top of his speculative range. That is a mischaracterization of the record.

- " . . . CWH claims it does not know how to quantify any of the IP portfolio's current value and has never had it independently appraised, although in the first quarter of 2022, it listed Own the Game for sale on a website marketplace for $199,900."

The SEC seems to be suggesting that CWH is hiding information about the value of its IP, but provides absolutely no factual support for that insinuation. Nor does it explain why it did not itself hire an expert to determine the value of the IP. It certainly could have done so and then would have been in a position to tell the court the actual value of these assets. The fact that Own the Game was listed for sale at $199,900 tells the court nothing about its actual value. One can list an item for any amount one chooses. The SEC neglects to mention that CWH received no bids for that asset at the value at the listed price.

---

[29] Ozgit, Deposition, pp. 153-54.

- Rabalais also has still regularly received monthly and quarterly reports that Underhill generates concerning trading activity on the platform. Notably, although Deihl is the current CEO of CWH and Managing Director of NSEI, . . . , Deihl does not receive these reports, nor has he requested them. (SEC *Appendix of Facts,* ¶ 121.)

Since January 16, 2024, these reports have been going to Deihl, and Rabalais does not receive them.

- "CWH also could elect to sell off its remaining IP portfolio to obtain revenue, but it has chosen not to do so." (SEC *Appendix of Facts,* ¶ 134.)

Although this statement is true, its implication is misleading. It seems to suggest that CWH could easily raise revenues by simply selling its IP. But selling off its IP would guarantee that the companies would have to declare bankruptcy. They would be unable to conduct any business without their IP. That tactic would be the quickest way of ensuring that the shareholders would lose 100% of their investments.

- "Own the Game actually may be worth far more than that, however, potentially even as high as $1.1 million." (SEC *Appendix of Facts,* ¶ 132.)

Again, this is rank speculation by the SEC. As already noted, CWH listed Own the Game on the web for $199,000 and received no offers. When the SEC asked Ozgit where that number had come from, he said:

> I don't think there was any valuation model. It was just a number that Mr. Deihl and I talked about and ran it by – by the trademark attorney, and then he said that we could list it at that price.
>
> I don't think that there was a lot of scientific modeling behind that valuation.[30]

[30] Ozgit Deposition, p. 30.

The SEC chooses to rely on this as proof that Own the Game is worth $1.1 million, despite the fact that that number is 550% of the price listed on the web – a price that was itself unsupported by any valuation, as Ozgit testified. The SEC is the plaintiff and has the burden of proof. If it wanted to establish the value of the IP, it could have done so with its own experts. Its failure to do so should be counted against it, not the defendants.

- ". . . aside from one unsuccessful attempt to open an account at a credit union, CWH and NSEI have not made any effort to open bank accounts." (SEC *Appendix of Facts,* ¶ 139.)

This statement correctly reflects the information that was available to the SEC when it filed its brief, but events have continued to unfold. Deihl persisted in his efforts to open a bank account for the companies after he was deposed. After being turned down by Unified Federal Credit Union, Deihl made inquiries at Wells Fargo, which also rejected CWH. Only two weeks ago, US Bank approved CWH's application to open a checking account. One of the bank's requirements was that there be at least two officers listed for CWH. So Deihl nominated Neil Brown as Treasurer for CWH and Michael Fineman as Secretary. They hold those positions on an interim basis and receive no compensation.

## MEMORANDUM OF POINTS AND AUTHORITIES

### A. The Burden of Proof Should Not Be Shifted to the Defendants in this Case Because the SEC Has Not Offered a Reasonable Approximation of the Defendants' Net Profits.

The SEC is seeking disgorgement and prejudgment interest of $1,468,556 against both defendants, jointly and severally. It also seeks civil penalties against each company of $1,116,140, for a total of $3,700,836. As the SEC represents in its brief, the total revenues for both CWH and

NSEI during the period covered by this lawsuit was approximately $1.8 million. In other words, the SEC is asking the companies to pay an amount that is more than 200% of the total revenues they realized. Defendants submit that the unreasonableness of that demand is apparent on its face.

When the Supreme Court ruled in *Liu v. SEC,* 140 S.Ct. 1936 (2020), that the equitable relief of disgorgement was authorized by 15 U.S.C. § 78u(d), it said that a disgorgement award that "does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." The disgorgement requested by the SEC far exceeds the defendants' net profits and is not awarded for victims. The statute is very clear that the court may award equitable relief that "may be appropriate or necessary for the benefit of the investors." 140 S.Ct. at 1940. This "'profit-based measure of unjust enrichment,' (citation omitted), reflected a foundational principle: 'It would be inequitable that [a wrongdoer] should make a profit out of his own wrong, (citation omitted).' The Court also recognized the long-standing equitable principle that "the wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person wronged.' (Citation omitted.)" 140 S.Ct. at 1943. The SEC's claim that disgorgement is "intended . . . to deprive a wrongdoer of any gross pecuniary gain obtained as a result of securities fraud"[31] is a misstatement of the law. It is intended to deprive the wrongdoer of net profits, not gross gain.

The SEC is correct when it states that, after it has made "a reasonable approximation of the profits causally connected to the violation," the burden shifts to the defendant(s) to show that the calculation is not correct. But the defendants submit that the SEC has not offered a reasonable approximation of the profits causally connected to the violation and that, consequently, it has not satisfied the legal standard for shifting the burden to the defendants. It asks the court to disallow 65%

[31] SEC brief, at 6.

of the expenses claimed by the defendants and is seeking a disgorgement total that is 65% of gross revenues for CWH and NSEI during the period covered by this case. That seems unreasonable on the face of it. It also flies in the face of the principle that "equity does not punish. . . . Rather, equity protects rights while avoiding injustice." *United States v. Bolton,* 496 F.Supp.3d 146, 164 (D.D.C. 2020). The SEC's prayer for disgorgement and civil penalties is flawed in at least two ways: First, there is little to no evidence adduced in support of its numbers. As already discussed, much of the evidence that is adduced by the SEC depends on mischaracterizations of the record. An estimate of the profits causally linked to the legal violation is not reasonable unless it is supported with facts, rather than speculation, assumptions, and inconsistent arguments. Second, despite the fact that disgorgement is an equitable remedy intended to compensate investors who suffered pecuniary harm as a result of the legal violations, the SEC has not said how its requested judgment is "appropriate or necessary for the benefit of the investors." In sum, defendants submit that the SEC has not offered the court a "reasonable approximation of the profits causally connected to the violation" and that, as a result, the burden of proof should not be shifted to them.

**B. The Equitable Principles Underlying Disgorgement**

In its argument, the SEC fails to take into account that disgorgement is an equitable, and not a legal, remedy. 15 U.S.C. § 78u(d)(5) provides that "any Federal court may grant . . . any equitable relief that may be appropriate or necessary for the benefit of investors." In *SEC v. Liu,* 140 S.Ct. 1936 (2020), the Supreme Court considered whether the statute authorizes the SEC to seek disgorgement beyond a defendant's net profits from wrongdoing." 140 S.Ct. at 1942. It answered that question in the negative.

The Court noted that

> [o]ver the years, . . ., courts have occasionally awarded disgorgement in three main ways that test the bounds of equity practice: by ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims, imposing joint-and-several disgorgement liability, and declining to deduct even legitimate expenses from the receipts of fraud. (Footnote omitted.) The SEC's disgorgement remedy in such incarnations is in considerable tension with equity practices.

140 S.Ct. at 1946. The SEC's requested relief in this case is, indeed, "in considerable tension with equity practices."

In *Liu,* the government argued that "the primary function of depriving wrongdoers of profits is to deny them the fruits of their ill-gotten gains, not to return the funds to victims as a kind of restitution." It took the position that "the very fact that it conducted an enforcement action satisfies the requirement that it is 'appropriate or necessary for the benefit of investors." 140 S.Ct. at 1948.

The Court rejected this argument out of hand. It said that "the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains. To hold otherwise would render meaningless the latter part of § 78u(d)(5). *Id.* The *Liu* opinion emphasized the need for courts to "deduct legitimate expenses before ordering disgorgement under § 78u(d)(5). A rule to the contrary that 'make[s] no allowance for the cost and expense of conducting [a] business' would be 'inconsistent with the ordinary principles and practice of courts of chancery.' (Citation omitted.)" 140 S.Ct. at 1949.

The Second Circuit recently had occasion to consider the holding in *Liu* in *SEC v. Govil,* 86 F.4th 89 (2d Cir. 2023). Govil had founded a company called Cemtrex, Inc. and had taken it public. He then engaged in three fraudulent securities offerings. He represented to investors that the company would use the proceeds to satisfy debt and for general corporate purposes. Instead of doing that, he

stole over $7.3 million and deposited it in his private accounts.

Govil reached a partial settlement with the SEC, agreeing to surrender all his stock in Cemtrex and giving the company a secured promissory note in the amount of $1.5 million. The SEC moved the trial court for additional disgorgement of $7.3 million. The court granted that request. After crediting Govil for his $1.5 million promissory note, it ordered the disgorgement of $5.8 million.

The appellate court reversed. Noting that "disgorgement under § 78u(d)(7) must comport with traditional equitable limitations as recognized in *Liu*, it held that one of those equitable limitations

> is that disgorgement must be awarded 'for victims.' *Liu,* 140 S.Ct. at 1940. Because a defrauded investor is not a 'victim' for equitable purposes if he suffered no pecuniary harm, the district court needed to determine that the investors Govil defrauded suffered pecuniary harm before awarding disgorgement. . . . . the district court abused its discretion in making the award without that predicate determination. (Footnote omitted.)

*Govil, supra,* at 94.

The Circuit noted that the Supreme Court in *Liu* "did not explain straightforwardly what a 'victim' is for the purpose of awarding 'equitable relief.' But it did provide "guiding principles." One of those principles is that a "remedy resides in the 'heartland of equity' when it 'restores the status quo.' (Citation omitted.) 86 F.4th at 102-03.

> If we were to understand 'victim' as including defrauded investors who suffered no pecuniary harm – and thus to allow those investors to receive the proceeds of disgorgement – we would not be restoring the status quo for those investors. We would be conferring a windfall on those who received the benefit of the bargain. (Footnote omitted.)

86 F.4th at 103.

The trial court in *Govil* had concluded that the investors in Cemtrex were victims because

> '[t]hey were promised that the proceeds of the offerings would be used for various corporate purposes,' but this promise was a 'lie.' (Citation omitted) . . . [i]t can hardly

> be said that an individual who invests in a company because he believes his investments are being used to help that company, but whose investment is then used to pay for unrelated expenses, is not the victim of said scheme.'

The appellate court vehemently disagreed. "On the contrary, we think it can be said. The district court's understanding of the term 'victim' may comport with some general dictionary definitions. (Citation omitted.) But the word has a settled legal meaning. A victim is a 'person harmed by a crime, tort, or other wrong.' (Citation omitted.)" The court noted that a private damages action for securities fraud under §10(b) of the Exchange Act and Rule 10b-5 requires that the investor have suffered an "economic loss" and that a suit for common-law deceit and misrepresentation requires proof of pecuniary harm. "In line with these principles, the investors whom Govil defrauded could not pursue individual fraud claims against him without showing a pecuniary loss. Were we to call those investors 'victims' without a similar showing, we would allow the SEC to forward proceeds of disgorgement to such investors and circumvent the limitations on private claims under § 10(b) and the common law." 86 F.4th at 104-05.

The appellate court also noted that the Supreme Court had recently ruled in *Ciminelli v. United States,* 598 U.S. 306 (2023) that federal fraud statutes are limited in scope to the protection of property rights. In that case, the Court considered the Second Circuit's "right-to-control" theory of wire fraud, which allowed fraud to be proved by evidence that the defendant had deprived a victim of potentially valuable economic information necessary to make discretionary economic decisions. It struck that rule down in *Ciminelli*, saying that the "right to control" is not recognized as a property interest and cannot form the basis of a fraud conviction.

That was essentially the error made by the trial court in its ruling in *Govil*. It held that the fact that the investors were told a lie was a sufficient basis for ordering disgorgement. It did not

consider whether any of them had suffered pecuniary harm. Indeed, the investors may not have been harmed at all because they received the return on investment that they had expected.

The wrongful gain obtained by the defendant is the correct way to measure disgorgement, but first the plaintiff has to establish that there is a basis for ordering disgorgement. Because

> disgorgement qualifies as 'equitable relief' and is authorized by § 78u(d)(5) and § 78u(d)(7) in the first place. . . . whether disgorgement is equitable relief turns in part on whether it is 'awarded for victims.' (Citation omitted.) Whether an investor has suffered pecuniary harm – bringing the investor into the category of victims – is a different issue from how to quantify the ill-gotten gains.

86 F.4th at 105.

Here the SEC's only effort to prove that CWH's investors suffered pecuniary harm is the simple statement that the "CWH equity shares are effectively worthless today without being registered, and are thus not transferable."[32] The only support for this *ipse dixit* is paragraph 89 of the SEC's *Appendix of Facts.* That paragraph simply repeats the same conclusion – *viz.,* that the shares are worthless because they are not registered. Repeating a conclusory claim is not actually evidence in support of that claim.

Not only has the SEC failed to offer any evidence in support of its claim that the shares are "effectively worthless," it has not addressed how that claim can be reconciled with its claims in other parts of its brief that CWH has a value "north of $750,000" and IP potentially worth millions. In its brief, it toggles back and forth between these two positions depending on the needs of its argument.

The SEC does not attempt to show any flaw in the Second Circuit's reasoning in *Govil*. It does not argue that *Govil* misapprehends the holding in *Liu.* It does not try to avoid its holding by distinguishing its facts from those of this case. The only argument that it offers as to why this court

---

[32] SEC Brief, p. 7, n. 5.

should not apply the holding in *Govil* to the facts of this case is that Second Circuit precedent is not binding in the District of Columbia. That, of course, is literally true. But, as the court is well aware, the Second Circuit is the epicenter for securities litigation in the United States because the stock exchanges are located in New York. The Second Circuit handles more securities cases than any other jurisdiction, and its holdings are generally respected and consulted by courts throughout the country. The *Govil* opinion is clear, well-supported with precedent, and based on sound reasoning. There is no D.C. Circuit law that is inconsistent with it. The defendants have not suggested that *Govil* is binding precedent for this court – only that it should look to that case as persuasive authority.

Despite arguing that the court should ignore the holding in *Govil,* the SEC does attempt to show that CWH's investors suffered pecuniary losses. It does so with a simple declaration that the CWH shares are now "effectively worthless" because the lack of registration prevents them from being traded. In making this argument, the SEC overlooks some important financial principles.

First, many investors have already received a benefit, in the form of tax deductions. NSEI was a 501(c)(3) Texas corporation throughout the time period covered by this suit. The SEC does not identify a single case in which the IRS disallowed a payment to NSEI as a valid charitable contribution, and the defendants are not aware of any.

Furthermore, the investors still hold their shares. Depending on the outcome of this litigation, they may well be able to trade them in the near future. It is difficult to determine the current value of stock in a company that is not generating revenue today, but that has developed two products,[33]

---

[33] In addition to the SportsShares on ASM, CWH has developed SportsRiskIndex ("SRI") futures, a risk management tool for sports leagues. The Commodities Futures Trading Commission has indicated that it would not object to the listing and trading of SRI futures by a designated contract market. CWH will definitely pursue this possibility if it remains in business.

owns extensive IP, has "goodwill associated with the platform, which . . . remains operational today with over 14,000 SportsShares trading accounts,"[34] has a relationship with a sports league in Canada, and will be under new management that will not repeat Rabalais's extremely flawed stewardship of the companies. Given the uncertainty engendered by the pendency of this litigation, defendants submit that it is impossible to say with any certainty what the current value of the companies is. The SEC does not offer any evidence in support of any of its contentions concerning valuation: not for its statement that the shares are worthless, nor for its statement that CWH is worth "north of $750,000" and its IP is "potentially worth millions". Defendants submit that the surest way to create value for their investors is to allow the companies to survive so that they can register the shares and reopen a market for them.

The SEC's statement that the shares in CWH are worthless because they are not registered stands in stark contrast to an argument it recently made in a different securities case. Defendants ask the court to take judicial notice of the SEC's brief in *SEC v. Ripple Labs, Inc., et al,*[35] a case that also involves unregistered shares being offer for sale. At page 17 of its brief, the SEC stated

> As a general principle, the Supreme Court has explained that one of the key benefits of disclosure, registration, and periodic filing of information is that it leads to more accurate securities prices. (Citation omitted.) One court in this District has specifically quantified the 'average discounts on [the trading price for] unregistered shares [as] . . . ranging from 20% to 35%.' (Citation omitted.) Economists have similarly found that unregistered shares of securities trading outside the robust disclosure requirements of U.S. securities exchanges are worth less and have limited liquidity relative to their registered or U.S. counterparts. (Citation omitted.)

Yet in this case the SEC is arguing that the discount on CWH's unregistered shares is 100%; that the

[34] SEC Brief, p. 25.

[35] Case No. 20-cv-10832 (AT) (SN) in the U.S. District Court for the Southern District of New York, Docket # 949, filed 3/25/24.

lack of registration has not diminished the value of the shares, but has wiped it out entirely. It offers no evidence or legal authority in support of this novel argument.

**C. The SEC's Disallowance of Most of Defendants' Expenses Is Not Reasonable.**

As already noted, the SEC contends that 65% of the business expenses claimed by NSEI and CWH should be disallowed. Its position is both unreasonable and in conflict with the case law. In addition, most of its arguments are conclusory, unsupported by any evidence or legal authority.

**1. Marketing Expenses**

The SEC asks the court to disallow all $733,488 in promotional and marketing expenses. The only rationale offered for its position is that the purpose of the marketing was to attract new customers.[36] The only authority cited in support of that rationale are non-precedential, unpublished opinions from several district courts around the country.[37] The SEC is in effect saying that all marketing expenses paid by any company that has engaged in any kind of securities fraud are, by definition, illegitimate. Defendants submit that the SEC has failed to adduce any precedential authority in support of this novel argument because none exists.

The largest item in this category is the $190,628 paid to Media Rewards Canada – a consulting company that was hired to advise the defendant corporations about extending their operations into Canada. It also looked into developing relationships with sports leagues and teams that might be interested in using NSEI to raise capital and/or to support its financial literacy projects, by coordinating those financial literacy efforts with educational institutions. Although those efforts have

---

[36] Of course, attracting new customers is the point of all marketing.

[37] The SEC does not indicate in its citations that these cases are non-precedential, as it is supposed to.

not yet borne fruit, this is precisely the type of work that will be required to spread awareness about ASM and to find future partners. Defendants contend that this is clearly a legitimate business expense.

Other marketing expenses included throwing parties in connection with the Super Bowl and paying influencers to attend these events, which were intended to raise awareness of the ASM platform and the sports investing concept. An itemized list of all marketing and promotion expenses appears as Exhibit 6.

### 2. Charitable Contributions

In its brief the SEC states

> In *Liu,* the Supreme Court looked at chancery principles in discerning the parameters of disgorgement and cited the general rule that "a defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement.' 140 S.Ct. at 1950. This reference makes clear that there must be some nexus between an expense and the tangible operation of a business for the expense to be a qualified expense. (SEC Brief, at 11.)

This is a rather fanciful representation of what the Court said. The "general rule" referred to is from the Restatement (Third) of Restitution and Unjust Enrichment. As noted, it is a general rule of equity, mentioned by the Court in passing; it is not part of the holding of the case. It is absurd for the SEC to claim that it defines the entire universe of allowable expenses and that anything that does not fall within its ambit is, by definition, not a legitimate deduction. Plaintiff has not adduced a single authority that says that charitable contributions in general are not legitimate expenses or that they are legitimate only if made to charities that have a "nexus" to the business purposes of the donating company.

The Fifth Circuit considered a similar issue in *American Cancer Society v. Cook*, 675 F.3d

524 (5th Cir. 2012). Cook had been appointed a receiver over the assets of several corporations and individuals that had allegedly violated federal securities laws. Before the SEC filed its complaint, the corporations had made charitable contributions to the American Cancer Society in the amount of $240,000. Cook moved to recover those contributions on the alternative theories that they were fraudulent transfers under Texas law or that the fraud by the companies justified disgorgement of the contributions. The trial court ordered the return of the funds, but the Circuit reversed, noting that "there was no evidence that [the] contributions furthered any fraudulent scheme or were otherwise made with intent to defraud investors." 675 F.3d at 530. The same considerations apply here. The SEC does not dispute that the entities receiving the money were real charities, and it does not claim that the contributions were made for the purpose of defrauding investors. They were perfectly legitimate expenditures and should be an offset to any disgorgement ordered by the court.

**3. Rabalais's Personal Payments and Benefits.**

Rabalais was the sole author of the fraud perpetrated in this case. He was the one who refused to register the securities, despite repeatedly being urged to do so by others involved in the companies. He was the one who misled investors by telling them over and over again that registration was imminent.

Defendants agree that Rabalais did not deserve to be rewarded for his malfeasance and that the $272,367 that he arrogated to himself is not a legitimate business expense.

**4. Unidentified Expenses**

Defendants concede that they do not have documentation in support of these expenses, which total $16,725.

As the defendants have already argued, they believe that no disgorgement should be ordered.

If the court determines that disgorgement is appropriate, the defendants submit that the only expenses that should be disallowed are the $272,367 that Rabalais appropriated for himself and the $16,725 for which the defendants have no documentation.

**D. The Court Should Not Impose Any Civil Penalties.**

The defendants submit that the court should not impose any civil penalties on them.

"'The purpose of a civil penalty is to punish the individual violator and deter future violations.' (Citation omitted.) *SEC v. Milan Group, Inc.,* 124 F.Supp.3d 21, 25 (D.D.C. 2015) (Collyer, J.)

Neither of those purposes would be advanced by the imposition of civil penalties on the defendants in this case. There was, in fact, one individual violator here: Christopher Rabalais. Until January 1, 2023, he ran both CWH and NSEI virtually single-handedly. Although there were nominally other officers and board members, he made all decisions unilaterally and rejected, over the course of several years, all the advice he received about the legal need to register the shares. A penalty imposed on the defendants will not punish Rabalais, as he is no longer involved with the companies. The SEC has requested that a penalty be assessed against Rabalais in his individual capacity as a defendant. While CWH and NSEI take no position on that request, they would note that imposing a penalty on Rabalais would at least serve one of the purposes of civil penalties by punishing the person who committed the violation. A penalty assessed against the corporate defendants would punish only the investors. A penalty that approaches the amount requested by the SEC would undoubtedly drive the companies into bankruptcy. Nor is there any need to deter future violations. If the companies survive this proceeding, they will be headed by Alper Ozgit, the man who repeatedly urged Rabalais to register the securities and begged him to comply with the laws. The

defendants have already provided some biographical detail about Ozgit.[38] His c.v. is attached as an exhibit, in order to provide more relevant detail about his qualifications to run CWH.

Neither Ozgit's qualifications nor his good faith can reasonably be questioned. During his deposition, the SEC entered into evidence numerous emails from Ozgit to Rabalais and some other members of the CWH inner circle expressing his concern that the donation program was actually an offer of securities and that they were required to register those shares with the SEC. Several of those emails are attached as exhibits to this brief.

Exhibit 8 contains a series of emails between Ozgit and Rabalais, among others, that were exchanged between October 27 and October 29, 2014. Ozgit composed a two-page email in which he said: "I cannot and will not let this go for a simple reason. While this is a legal question the answer to which needs to be determined, I am concerned that we may be violating the securities laws here, and possibly some state laws as well. So we need to take action and make sure we comply." He also said, "I spent a lot of time reading the securities laws today. They are very complicated but based on my reading I am concerned that we are not completely following the letter of the law."

Exhibit 9 is an email thread that was exchanged on February 24, 2015. Ozgit wrote to Rabalais and three others: "Guys I have a really bad feeling about these offers. This thought just doesn't leave me – this will be construed as a securities offering and I am not sure that we will overcome that argument."

Exhibit 10 contains emails exchanged on November 2, 2015. Paul Bleier told Rabalais that they should retain counsel. "A legal opinion is probably the best route to take here, despite how much that makes you cringe Chris." Rabalais responded with two lengthy rants, which included the

[38] *See supra,* at 4.

following statements:

> We won't be paying for any legal opinion. I want someone to point out **ONE SINGLE THING** we've accomplished with lawyers. Give me one.
>
> Absolutely everything positive that has happened in this business had **ABSOLUTELY NOTHING** to do with worthless lawyers. Nothing. Zero. Zippo. Zilch.
>
> They are overpriced lying manipulative parasites. The world would be better off without them.
>
> There is no such thing as getting a legal opinion for a fee in this matter. Anyone you involve will ask for a retainer and then entrench themselves in our budget to 'fix things' and 'watch things'. Of course, if anything negative happens, they'll find 1,000 reasons why their legal opinion was just that 'an opinion' and then they'll flee evading all responsibility for what you paid them for. I have seen this **ONE HUNDRED PERCENT** of the time in my experience across multiple attorneys from different countries and on vastly different matters.
>
> Maybe ... just once upon a time, lawyers served some worthwhile and respectable role in society. That time is long past. (Emphasis in original.)

Exhibit 11 is an email thread exchanged between Ozgit and Rabalais on August 30 and 31, 2016, which contains much of the same discussion that has featured in all the other exhibits. Rabalais was clearly tired of hearing Ozgit's concerns, telling him that "we've been around this tree before." When he asks Ozgit whether something he suggested is "a good outcome for you", Ozgit's response is "Well – a good outcome for me is doing the right thing, . . . ." There were several more exchanges along the same lines.

These exhibits, along with others like them, make it clear that Ozgit, and some others associated with CWH, spent years trying to get Rabalais to do the right thing: to hire a lawyer and register the shares with the SEC. Rabalais simply refused, while concurrently falsely assuring investors that registration was imminent. With him out of the companies and Ozgit in charge, there would be absolutely no reason for the court to fear any future violations of the securities laws – or,

indeed, of any laws at all. Neither of the established purposes for civil penalties would be served by the court's imposition of civil penalties on the defendants. A penalty would not punish the wrongdoer – *i.e.,* Rabalais – because a penalty levied on the corporations would not affect him. And there is no need for the deterrent value of penalties because a company headed by Ozgit would be very unlikely to engage in any wrongful conduct.

It is also instructive to compare this case with another SEC enforcement action with a much higher profile: the enforcement action against Theranos, Inc. Elizabeth Holmes and Ramesh Balwani raised more than $700 million through "an elaborate, years-long fraud in which they exaggerated or made false statements about the company's technology, business, and financial performance."[39] The parties reached a settlement. Holmes agreed to pay a $500,000 penalty, accepted a bar from serving as an officer or director of a public company for 10 years, and relinquished her voting control by converting her "super-majority Theranos Class B Common shares to Class A Common Shares." Most interesting is the fact that no penalties were levied on the corporation, but only on the individuals responsible for the fraud. Holmes is now serving a prison sentence for the massive fraud that she perpetrated. If the SEC did not demand that penalties be imposed on Theranos, as opposed to the two individuals who were running it, it is hard to understand why it should find them necessary in this case.

The SEC's website states that its mission is "to protect investors; maintain fair, orderly, and efficient markets; and facilitate capital formation." Yet it has not expressed any interest in protecting the investors in this case. If the court awards the disgorgement and penalties requested by the

[39] SEC Press Release, dated March 14, 2018.
https://www.sec.gov/news/press-release/2018-41

Commission – or, indeed, anything close to it – CWH will be driven into bankruptcy, as it does not have any current assets that would allow it to make those payments. All of the investors would lose 100% of their investments.

CWH is concerned about the welfare of its investors. In order to gauge their desires in this matter, it sent out a questionnaire to all the investors that they could identify. The results of that questionnaire appear as Exhibit 14. As the court can see, the defendants made no effort to influence the results. The shareholders were asked to choose between two alternatives: "1) As a preferred and/or common stockholder in Crystal World Holdings, Inc., my preference as an investor would be to see the company survive and move forward under new management; or 2) As a preferred and/or common stockholder in Crystal World Holdings, Inc., my preference as an investor would be to see the company enter bankruptcy proceedings." The defendants have included every response they received; they have edited nothing.

Exhibit 12 is a chart summarizing the results of the questionnaires from the top twenty shareholders who responded to the survey. All of those investors indicated a preference for the companies to continue under new management. That exhibit also contains a legend that can be used for understanding Exhibit 13, which is a list of all the shareholders who answered the survey. The survey was sent by email to all 935 shareholders. 104 responded. Of those who responded, 98 indicated that they would like to see the company move forward under new management, rather than enter into bankruptcy. Those 98 people represent 94.2% of the shareholders who responded and collectively own 64.41% of all shares issued. 62 emails bounced back. There was one neutral response (no preference indicated), and five people voted for bankruptcy.

The defendants submit that, given the fact that disgorgement is an equitable remedy intended

to make defrauded investors whole, the preferences of those investors should be taken into account in determining the outcome of this case.

**E. The Future of CWH**

If CWH can survive this litigation, it is anticipated that Alper Ozgit will become the CEO, and Chad Deihl will stay on as the COO. Ozgit is familiar with CWH's products and IP. As a senior economist with close to twenty years of consulting experience, he is confident in his abilities to navigate CWH to success.

Ozgit and Deihl both believe in the concept of making sports an asset class. Since August 1, 2019, CWH and NSEI have incurred over $110,000 in expenses, all of which has been covered by Ozgit, Deihl, and a few of the other larger shareholders. In other words, they have put their money where their mouths are. Their commitment of substantial time and money to keep CWH afloat is proof of their belief in the business model and of their claims that they very much want to see their investors avoid financial losses.

Since January 1, 2023, when Rabalais stepped down from his position as CEO, real progress has been made. Canadian counsel[40] has been retained to advise the companies about working with the Ontario Securities Commission and with individual provincial governments in order to comply with all applicable Canadian laws and regulations. There have been a few meetings with a prospective sports league partner in Canada, and two meetings have been held with the Ontario Securities Commission. The shareholders have responded positively to the changes. Their optimism about the future of the companies is reflected in the responses to the survey that was sent out, which indicates a strong preference for CWH and NSEI to remain in business.

---

[40] Wildeboer Dellelce LLP, in Toronto.

**F. The Defendants Request an Evidentiary Hearing.**

The SEC has requested oral argument in this case, and the defendants join in that request. Although it is unusual for a case such as this, the defendants also request an evidentiary hearing. They believe that a hearing is necessary in this case because of the large number of factual misstatements by the SEC. The court will have to credit the factual representations of one side or the other. The best way for the court to make credibility determinations is by listening to witnesses who will be subjected to cross-examination.

## CONCLUSION

The defendants pray that the court enter final judgment without ordering any disgorgement or imposing any civil penalties on defendants Crystal World Holdings, Inc., and the New Sports Economy Institute, for the reasons contained in this brief.

Respectfully submitted,

/s/Cheryl D. Stein

Cheryl D. Stein #256693
1824 N. Capitol Street, N.W. #1
Washington, D.C. 20002
(202) 388-4682
Cdstein3@verizon.net
Counsel for CWH and NSEI

**CERTIFICATE OF SERVICE**

I certify that on June 14, 2024, I caused to be served the foregoing reply brief by Crystal World Holdings, Inc., and the New Sports Economy Institute by using the court's CM/ECF system, which will send notification of the filing to defendant Christopher Rabalais and plaintiff SEC at the following addresses:

Christopher Rabalais, chrisrabalais@live.com

Patrick R. Costello, costellop@sec.gov.