UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | . | |
| Plaintiff, | . | CA No. 19-2490 (CJN) |
| v. | . | |
| CRYSTAL WORLD HOLDINGS, INC., et al., | . | Washington, D.C. Friday, October 25, 2024 10:00 a.m. |
| Defendants. | . | |

. . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE CARL J. NICHOLS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For Plaintiff SEC: | PATRICK R. COSTELLO, ESQ.<br>Securities and Exchange Commission<br>100 F Street NE<br>Washington, DC 20549 |
| For Defendants Crystal World Holdings, New Sports Economy Inst.: | CHERYL D. STEIN, ESQ.<br>Cheryl D. Stein, Attorney at Law<br>1824 North Capitol Street NW<br>Suite 1<br>Washington, DC 20002 |
| Court Reporter: | BRYAN A. WAYNE, RPR, CRR<br>U.S. Courthouse, Room 4704-A<br>333 Constitution Avenue NW<br>Washington, DC 20001<br>(202) 354-3186 |

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK: Good morning, Your Honor. This is civil case year 2019-2490, Securities and Exchange Commission versus Crystal World Holdings, Incorporated, et al. Counsel, please come forward and introduce yourselves for the record, beginning with the plaintiff.

MR. COSTELLO: Good morning, Your Honor. Patrick Costello on behalf of the SEC.

THE COURT: Good morning.

MS. STEIN: Good morning, Your Honor. Cheryl Stein on behalf of Crystal World Holdings and the New Sports Economy Institute. Present with me is Chad Deihl who is the CEO of Crystal World Holdings and a managing director of NSEI.

THE COURT: Good morning. And we received an email that Mr. Rabalais would not be present by video, so I think we have everyone here. Obviously, there are some people watching by video, but I think everyone who is going to be speaking is here in person.

We're here on obviously the question of what financial award or judgment I should enter, the parties having agreed as to liability determinations already. With respect to the -- so people know what I've done to prepare, read all the briefs, some of the supporting materials, I have a pretty good handle on the statutory language both as to disgorgement and as to penalty. Read, among other things, the relevant disgorgement

cases.

But really what I intend to do this morning is to take this as a traditional oral argument. I'm not going to hear evidence, I'm not going to hear testimony. I don't think that's necessary yet. Obviously, to the extent I determine it is necessary, we'll cross that bridge later. But really I want to treat this like a regular oral argument, and I'm going to hear from the Commission first.

So Mr. Costello, why don't you come up to the podium. I'll then hear from you, Ms. Stein, in response. I'll give Mr. Costello the opportunity for a short rebuttal if it's warranted, and then perhaps a short surrebuttal at the end, Ms. Stein.

I don't have -- I don't set time limits for arguments. It seems to me that targeting around a 20-minute to 30-minute opening -- I mean, I'll have a bunch of questions, we'll see how it goes, do the same for Ms. Stein, and then a rebuttal. Okay?

MR. COSTELLO: Understood, Your Honor.

THE COURT: You may proceed.

MR. COSTELLO: Your Honor, the SEC in this case seeks disgorgement and prejudgment interest in the amount of approximately $1.4 million. And we seek that on a joint and several basis. And the SEC also seeks civil penalties in the amount of $446,458 against Mr. Rabalais, and approximately 1.1

million each against Crystal World Holdings and NSEI.

I would just point out just to start with, Your Honor, that, as I'm sure Your Honor saw in the briefing, that disgorgement and civil penalties are separate remedies --

THE COURT: Yes, I know.

MR. COSTELLO: -- in federal securities laws. We believe that the amounts we've requested are reasonable, appropriate and tailored to the misconduct in this case, which as the Court knows consists entirely of what is called the donation program, which took place for the better part of almost five years.

The disgorgement amount of $1,468,656, that's just straight math, Your Honor. That is the amount of net profits remaining after crediting for appropriate qualified business expenses under the Supreme Court's decision of *Liu*. And the penalty amounts come right out of the statute.

And we believe that they will serve the dual purpose of not only penalizing the defendants for the past misconduct in this case, but also serving as a deterrent and a warning to other would-be fraudsters that a scheme like the donation program in this case is in fact illegal under the securities laws. And we therefore would ask the Court to enter final judgment imposing both of those amounts.

Starting with disgorgement, Your Honor, the principal purpose of disgorgement here in the D.C. Circuit is to deprive a

defendant of unjust enrichment. Now, while other circuits may look at it differently, here in the D.C. Circuit, the purpose of disgorgement is not to refund others for losses or otherwise return investors to the status quo. And that's out of the *Zacharias* case here out of the D.C. Circuit. It is to return the defendant to the status quo in the sense of requiring the defendant to give up the amounts by which he was unjustly and unlawfully enriched.

Disgorgement is authorized under Section 21(d) of the Exchange Act. And in terms of the standards, the SEC need only show what's called a reasonable approximation. And the D.C. Circuit in *First City Financial* defined that as the SEC has to show there is a link between the misconduct at issue and the proceeds obtained. The burden then turns to the defendant to show that there is no link between the two.

Now, in the case of an unregistered securities offering such as the one here, or fraud in connection with that offering, also as it applies here, the SEC satisfies the standard by showing the amount of proceeds raised through the offering.

There is no dispute in this case that the total proceeds raised were approximately $1.8 million. There is no dispute about that number. There is no dispute that those proceeds stem directly from the illegal donation program. So the SEC has satisfied its preliminary obligation to show reasonable approximation.

The question is whether or not that amount should be offset under the Supreme Court's *Liu* decision to allow for what the Supreme Court called qualified business expenses, which I'll address in a second, Your Honor.

THE COURT: But before that, I think defendants' probably primary argument is disgorgement, at least under *Liu*, perhaps just in general, has to include a component of thinking about victim losses. And think -- the first question I have on that topic is, imagine we were all writing on a clean slate and all we actually had was the statute as it currently exists, and in particular Section 7, which says disgorgement is something the Commission can seek. That's not a defined term in the statute, "disgorgement."

I take it the Commission's view is that "disgorgement" used there does not require any thought to victim losses, even the proof that there were, let alone that disgorgement is limited to proven victim losses. Yes?

MR. COSTELLO: That's right, Your Honor.

THE COURT: And what is the authority for the proposition that disgorgement means only looking to ill-begotten gains by the wrongdoer?

MR. COSTELLO: Your Honor, the authority for that is the *Liu* decision itself. I think what Your Honor is referring to is this question about the Second Circuit's decision in *Govil* and whether or not it is necessary for the court to find

pecuniary loss in order to find an entitlement to disgorgement.

What I would say to the Court is -- and again, looking at the way *Liu* encountered this issue, at the time *Liu* was decided, Section 21(d) of the Exchange Act did not actually have the word "disgorgement" in it.

THE COURT: Right. It had equitable relief under 5, and then the question was whether equitable relief includes disgorgement, and the courts concluded that it did, but that that disgorgement had to have some -- first of all, it had to be equitable, and then the question was what does that mean.

MR. COSTELLO: Correct, Your Honor. So what the Supreme Court said is in order for it to be equitable, it has to be based on the defendant's net profits. So the way the Court looked at it was that net profits are understood in the context of the gains made upon the business and taking into account the receipts as well, which is what prompted the Court to say net profits.

Now, the other aspect to that language in Section 21(d)(5) is "for the benefit of investors," and this is where I think *Govil* went astray slightly on this issue, because *Liu* said that for the benefit of investors -- the concern when *Liu* was deciding this is that if the SEC did obtain a disgorgement judgment, rather than disbursing it to investors as part of the distribution, the SEC would disburse it to the Treasury.

So the Supreme Court said well, that doesn't sound like it's benefitting investors, it sounds like it's benefitting the public at large. So what *Liu* said is that a district court, after determining that disgorgement is appropriate, and after calculating it based on the net profits, the district court then has to determine how a distribution would take place, whether it would be feasible, what the parameters would be. And we have included a provision in our proposed final judgment, Your Honor, that accounts for this process --

THE COURT: Yes.

MR. COSTELLO: -- that we may propose, a distribution plan to the Court.

So the problem, though, is that the reason why *Govil* on this issue may have gone astray is because in 2021, effective January 1 of that year, Congress amended Section 21(d). And now in 21(d)(3) and (d)(7), as Your Honor observed, there is an express provision for disgorgement. Neither one of those subsections, though, Your Honor, contains the "for the benefit of investors."

So I think the problem here is that *Govil* seems to suggest that pecuniary loss is required in the first instance. That is not what *Liu* said at all. *Govil* is reading a provision into *Liu* that is not there. The concept of the for the --

THE COURT: *Govil* or perhaps the prior Second Circuit opinion that *Govil* was dealing with, yes.

MR. COSTELLO: Correct, Your Honor. And I would also just point out, though, that it's not just that prior decision. Something else the Court might want to take into account is that there was another Second Circuit decision after *Govil*. It was *SEC v. O'Brien*, which arrived at the Second Circuit in the same posture as *Govil* did, in the remedies phase of an SEC enforcement action, just like we are here today.

*O'Brien* encountered the question of disgorgement. *O'Brien* cited to *Liu*, cited to the concept of net profits being the gains versus the receipts, and accounting for qualified expenses, and found that the district court's disgorgement award and analysis was correct.

Curiously, though, the *O'Brien* court made no mention of *Govil* at all. And also, earlier this year, in July, the First Circuit in *SEC v. Navellier Associates*, we cited the district court's opinion as part of the business expense analysis. But that went up on appeal. That was decided I think at the end of July, so that would have been after we filed our reply brief.

The First Circuit refused to apply *Govil* in the context of disgorgement because *Liu* itself stresses that it is a profits-based remedy, it is designed to return the defendant to the status quo by depriving the defendant of unjust enrichment, as long as that is done on a net profit basis, and

the court does account for a potential distribution that satisfies *Liu*.

THE COURT: So let's just assume that *Liu* was, as you read it, was really about returning the defendant to the defendant's status before the fraud or before the misconduct, and so all we really care about is looking at, I'll say the defendant's side of the ledger, not worrying about pecuniary loss to investors, but was also concerned about the language or taking -- there has to be a world where you account for the benefit of investors. But that *Liu* in general is just about when we think about disgorgement, we think about the defendant's conduct, the defendant's gain, returning it to the status quo.

If that's right, what was Congress doing when it added, for example, disgorgement as an express remedy? Was there a problem then that Congress was fixing with *Liu*?

MR. COSTELLO: I think that may be fair to say, Your Honor. I think the point Congress was trying to make is that there is no longer a need to imply disgorgement into Section 21(d)(5). Now that it is express, there is no question that the Commission is entitled to disgorgement, assuming that it satisfies the standards, and that disgorgement is based on depriving the defendant of unjust enrichment.

I would also note, though, Your Honor, that here in the D.C. Circuit that has always been the way that the circuit has

looked at it. Starting with *First City Financial*, going through *Zacharias*, this circuit has always said that the point of disgorgement is to deprive a defendant of unjust enrichment. And *Zacharias* went so far as to say disgorgement is not intended to refund investors for losses.

THE COURT: So before we turn to the offset question or questions, am I right with respect to the following two propositions? First, to the extent that disgorgement requires the proof of some pecuniary loss, that there was some pecuniary loss, the Commission believes it satisfied that here because the record reflects, I take it, that there are at least some investors whose current value of whatever they have is less than their investment. Fair?

MR. COSTELLO: I think it's fair to say, Your Honor, that all investors who hold Crystal World Holdings equity shares, all of those shares are worth nothing right now. So all of those investors have experienced a loss.

THE COURT: So -- okay. So not only has there been from the Commission's perspective some pecuniary loss, but I take it that the Commission's view then is if *Govil* was the law here and if we had to think about disgorgement as limited by investor losses or pecuniary loss, that you could calculate those losses by saying, maybe, the proceeds of $1.8 million are the investments, those investments are worth zero now, therefore the pecuniary loss is $1.8 million. Is that right?

Is that your position?

MR. COSTELLO: That would be one way of looking at it, Your Honor.

THE COURT: Okay.

MR. COSTELLO: The other way of looking at it is that -- in terms of what the shares could be valued at. Now, remember, we cited in our appendix deposition testimony from Mr. Rabalais, who noted what the importance of registration was in investors' minds. And he said, the first thing investors hear when they hear about registration is great, now I can put it on the market and sell them. So there is that quantification as well.

But I would just point out, though, when it comes to this concept of quantification, *Govil* itself was very clear that it's not the quantification of the loss that has to be established. The only quantification that *Govil* talked about -- and correctly so -- was the quantification of the defendant's gain. All *Govil* said was that there just needs to be a finding that there was loss, not that it be quantified.

THE COURT: Right. And that's why I separated them out into two different points, because it seems conceptually at least you could have two different regimes. One is so long as there is some pecuniary loss to investors -- and it could be a small amount -- so long as you have some loss to investors, then the quantification of the disgorgement amount is entirely

defendant-focused.

Or you could have a different world that says not only do you have to have some pecuniary loss to investors, but when you're thinking about returning the status quo, that means a disgorgement award that makes investors whole, or is capped by making investors whole. And so we care both about the defense side of the ledger but also the investor side of the ledger.

And I think that's the defendants' argument here, is that -- I mean, I'll hear from Ms. Stein, but it seems to me their strongest argument is the Commission was required -- or disgorgement is capped at what the Commission proved were pecuniary losses by investors. The Commission hasn't proven any such pecuniary losses, or at least it hasn't quantified them, and so therefore you can't enter any disgorgement award at all.

Your -- I think you've got a number of responses to that. One is, even under *Govil*, all you care about is whether there was a pecuniary loss or not, not a quantification. *Govil*'s wrong, so you don't even have to do that step in the D.C. Circuit.

And then I think perhaps your fallback argument would be, even if we had to prove under *Govil* there was some pecuniary loss, and even if defendants were right that disgorgement is capped by pecuniary loss, the record establishes here that investors lost up to $1.8 million. The proceeds on the 1.8

million are the same as pecuniary loss because the value of the companies and therefore of the investment is presently zero, or close to it.

You agree with everything I just said?

MR. COSTELLO: I think that's correct, Your Honor.

THE COURT: Okay. Okay. So now let's talk offsets.

MR. COSTELLO: The offsets in general, I just want to start on this by just noting what is in dispute and what is not.

THE COURT: Yes.

MR. COSTELLO: It is not in dispute that these expenses can be documented. It is not in dispute that they were incurred. And it is not in dispute that they were paid. The only thing that's in dispute is whether or not certain categories of the expenses by their very nature do not count as qualified business expenses under *Liu*. And we have taken issue with four of the categories in general.

One is the promotional and marketing expenses of about $733,000. The second, or the charitable contributions of about 169. The third are the personal payments to Mr. Rabalais, about 272,000. And the last category is the unidentified expenses, about 16,000.

As I understand it, the defendants are not disputing the last two categories. So it's really just a question of the first two and whether those should be included in the offsets.

Now, the total expenses are $1.828 million. The total proceeds as I said before, 1.805. So we are only contending that certain of those categories should not be included. And you'll see --

THE COURT: Right. The Commission's view is there are expenses that are appropriately offset against the proceeds. But there are others that are not.

MR. COSTELLO: I think it's fair to say there are expenses that are there that we're not contesting, I think would be --

THE COURT: Fair enough.

MR. COSTELLO: When it comes to the promotional expenses, we describe this in the briefing in detail. Those expenses were intended to promote the AllSportsMarket platform, to spread awareness about it, to get in more people to participate on the platform.

And if I might just segue for a moment just to make sure that we're all talking about the same thing, that platform, the AllSportsMarket platform is that marketplace where people can buy and sell virtual shares of sports teams, known as SportShares.

And I just want to be clear that this case is not about that, Your Honor. We're not contending there's anything wrong with the SportShares or with the platform itself. The history of the platform, the foundation, the operation, its future

plans, however well intentioned the defendants may have been with the platform has nothing to do with this case. This case is entirely about the donation program itself, which was donations made to NSEI in return for which investors received those free equity shares of Crystal World.

But ASM is owned, or I should say operated by NSEI, and the intellectual property behind the marketplace is owned by Crystal World. So the point in these expenditures that were incurred was to promote ASM. In fact, there was a large portion of it, about 121,000, where those were payments made to people who were trading those virtual shares in order to -- I should say dividend payments to those traders, as market makers, to show the public that this marketplace worked.

There were other expenses, media campaigns. In fact, in one instance one of the representatives of the companies appeared on CNBC's Squawk Box to talk up this platform and the concept of sports shares in general. And Mr. Rabalais had testified afterwards that that in and of itself was extremely successful. Thousands of people had signed up to join ASM in this marketplace. And as Mr. Rabalais acknowledged, that made a significant difference in terms of the donation program participation, because once you became an ASM member, you were then privy to all of the donation program emails that Mr. Rabalais had posted on the member forums, people could see all of that.

And the current CEO, Chad Deihl, had acknowledged at his deposition that it is fair to say that the more people that participated on ASM, the more likely it was that they would contribute and participate in the donation program.

So all of this is to say, and the cases we've cited I think make clear, that when you take investor money and you spend that in order to get more investor money from more investors, that expense is not a proper expense --

THE COURT: And I'm not sure the defendants exactly make this argument, but this is at least the way I've been noodling through this, is -- I think the Commission would agree, and certainly the way you just framed it, that the way the companies and Rabalais were using the proceeds had multiple purposes?

I mean, the marketing expenses were designed to market the ASM platform, which as you said earlier you don't challenge as a general proposition. And that made good sense because that's the business and they're trying to market that business as a legitimate thing. But it also had the purpose, the marketing expenses, of hopefully I suppose from their perspective, generating more investment.

So it seems to me that it's certainly not the case that the marketing expenses were incurred solely for the purpose of inducing additional investments. And seems to me that -- the question I have is at what point does a marketing expense that

is designed for the purpose of marketing the business generally become a marketing expense that is not entitled to be offset because it's sufficiently related to the procurement of additional investments?

I mean, imagine hypothetically like Apple engaged in some securities violations. And people were investing in Apple through unregistered shares or something like that. And Apple has a massive marketing budget, and the vast majority of Apple's marketing budget is going to make Apple and its products seem terrific, but would also have the consequence of inducing people to invest through the unregistered shares.

So what's the line between marketing that has admittedly dual purposes and you wouldn't really think of as tethered to the securities violation, and marketing that has dual purposes, as here, that is?

MR. COSTELLO: I think that you can draw the line with this case, Your Honor, and you can say that in this case the sole focus -- at least the evidence points to the fact that the sole focus during this time period was to do whatever was necessary to support this AllSportsMarket platform.

And the way to do it was to get funding, because obviously it costs money to get this platform operational and off the ground. That's where the donation program came into play here. It was the primary funding source that Mr. Rabalais used in order to continue and to be able to expand upon ASM.

THE COURT: So your view is essentially the link is tighter here than it would be in other cases where you have marketing that is for a company generally and then this sort of one-off or side business of, you know, perhaps unregistered securities. Here it's all of a piece.

MR. COSTELLO: Precisely, Your Honor.

THE COURT: And I take it another piece of your argument is to the -- so that's generally true, and then to the extent that one wanted a more precise way of thinking about specific marketing expenses and whether they were -- put it this way, more of the purpose of marketing the company versus designed to procure additional investment, that once you come forward with the proceeds and some top line offset arguments, the burden shifts to the defendants to come in and perhaps parse out more specifically along the lines of the way I'm suggesting than they have. I mean, there's a burden-shifting component to this analysis from your view. Right?

MR. COSTELLO: That would also be fair, Your Honor. I would say, though, that during discovery, there is deposition testimony which we've cited to in our briefing where we went through the different expenses in the category. And there is testimony as to what the expenses were for in that category. And I think it's fair to say that in this instance -- and again, drawing the line using this case as an example, where

the whole point of this was to obtain the funding to be able to promote this marketplace, the donation program itself was the fraud. And there is no dispute here that it was the fraud. The defendants have already consented to that aspect of this.

THE COURT: Put differently, just -- sorry, I -- if the defendants had a hundred million dollars in revenue from ASM and other sources and, you know, got one or two million dollars from a donation program, and the marketing was about the entire enterprise, then maybe you'd have to think about whether you could really link all marketing expenses to the donation program.

But in your view, it's something a little bit more like -- and I'm not sure I have it precisely right -- here, really, where the donation program was the principal source of funds, then marketing, even if it's sort of generally thought of about the enterprise generally, is necessarily or at least principally linked to the donation program because that's where the funds were coming from. Is that generally a fair way of thinking about it from your perspective?

MR. COSTELLO: Yes, Your Honor.

THE COURT: Okay.

MR. COSTELLO: And so the point being that if you look at it in that context, given the interrelationship between the two, our position is that these types of expenses, which other

courts have looked at in precisely the same way, are wrongful gains under another name --

THE COURT: It seems very clear to me the doctrine is you don't get to offset expenses if they were incurred for the purpose of engaging in the fraudulent conduct. And the only question I have is whether the -- is how the marketing expenses are, or whether they are in all respects sort of close enough to the donation program rather than some other benefit to the enterprise that you would sort of split them or something. But I have your point.

MR. COSTELLO: Correct, Your Honor.

The second category of expenses that we believe should not be offset are the charitable contributions.

THE COURT: Which are basically analytically different in your view, right?

MR. COSTELLO: Somewhat analytically different.

THE COURT: Somewhat.

MR. COSTELLO: And I will say that the expenses here to American Red Cross, the World Food Program and World Vision, those charities were unrelated to the mission of NSEI, which is a charity, which is to provide a sports-based financial curriculum and education. And Crystal World's business purpose, its sole business purpose was to just be the holding company behind the IP.

So we contend that these charitable donations were

unrelated to the business. Now, how does that relate into the way that cases look at it? If you look at *Liu*, and actually to some extent *Govil*, which also made the same citation on this issue, they both cited the restatement in noting that when it comes to business expenses in the concept of net profits, those have to be, quote, marginal costs incurred in producing the revenue.

And -- in other words, we say that -- or we submit that there should be a connection, a nexus between the business's operation or purpose and the expense, otherwise anything could be considered an expense. And that is not what *Liu* was getting at --

THE COURT: What does the record reflect was or were the purposes for these charitable donations?

MR. COSTELLO: As we understand it, there were payments made to charities. As I understand it, in some of the program emails I believe that investors were told that in return for your donation, you would receive, again, these equity shares, other items in that mixed basket, and then I believe it said a portion of the donation funds would be donated to charitable causes.

So this is not a question of the funds being used in a way different from how they were represented, and it's not a question of the propriety, so to speak, on that end. This is just a question of whether these are properly qualified and

credible expenses under *Liu*. And again, looking at the way *Liu* looked at this, marginal costs incurred, we contend that that does not qualify as a marginal cost incurred. And we cited the Court to a few cases who have looked at this. And again, regardless of the purpose behind it or the complementary side behind it, it just doesn't qualify under *Liu*'s analysis.

And I would also just point out, though, that when it comes to not only the charitable expenses but also any type of expense in the analysis under *Liu*, there is no requirement that any of those expenses be made with any kind of fraudulent intent.

I think there was a citation in the defendants' papers to a Fifth Circuit case that was allowing for a charitable expense payment, because apparently it was not made with fraudulent intent. But that case dealt with Texas's fraudulent transfer law, and in order to have that clawed back, there had to be proof that it was done with fraudulent intent. *Liu* does not have any requirement that any expense, charitable or otherwise, be made with fraudulent intent.

THE COURT: Okay.

MR. COSTELLO: So if the Court were to agree with the SEC's position on these categories of expenses, that would mean that of the 1.828 million in expenses claimed, the Court should reject approximately 1.2 of those. That would leave

about 636,000 in creditable expenses. And if you were to offset those creditable expenses from the 1.805 million in proceeds, that leaves net profits of $1,169,039. And then from that amount prejudgment interest would be added, and that takes us to --

THE COURT: 1.4.

MR. COSTELLO: -- 1.4 million.

THE COURT: Okay. So let's turn to the penalty.

MR. COSTELLO: I would also just point out, Your Honor, that on the question of disgorgement, as I said earlier, we believe it ought to be --

THE COURT: Joint and several.

MR. COSTELLO: -- joint and several for the reasons we laid out in our briefing.

Now, on the concept of penalties, as I said before, they are statutorily based, they're in Section 20(d) of the Securities Act, and they have the dual purpose, again, of not only penalizing for past misconduct but also serving as a deterrence to future would-be fraudsters. But unlike disgorgement, penalties cannot be joint and several in the D.C. Circuit. So each defendant would have to get their own penalty.

The way that the statute lays out the calculation is that the court can apply the greater of the gross amount of pecuniary gain, which is a little different than we talked

about with *Liu*, or the specific statutory amounts in the different tiers. Whichever metric or numeral is greater, that's what the statute allows the court to apply. And when it comes to the gross amount of pecuniary gain, that would be the straight amount of proceeds that were obtained, so the 1.8 million. So the court can take the 1.8 million or various numbers in the tiers and multiply that by the number of violations.

Now, the statute doesn't define what "per violation" means, but other courts have defined that term to mean or using as a metric, for example, the number of investors involved, or the number of misstatements that were made, or the number of securities law violations charged in the complaint, or even other courts have said just simply treat it as one single plan or scheme.

In theory here the court could take that 1.8 million and multiply it by any number, and using any of those metrics, which could result in a very significant penalty, which we think would be warranted given the misconduct here, but as we've said in our briefing, we think it would be more appropriate for the Court to take a two-time third-tier violation, and the third-tier amount is -- again, the tiers, we explained that in our briefing, but just generally, the third tier, which is the most serious of the tiers, is for violations of the securities laws that involve fraud and that

either result in significant investor loss or pose the risk of significant investor loss, which we think is met in these circumstances.

So if the Court were to do that, a two-time penalty, one for the violation of Section 5 and one for the violation of Section 17, doing that comes to 446,000 and change, as I said earlier, against Mr. Rabalais. And 2.2 million against the two companies, and assess half of it to one and half of it to the other.

The way that the D.C. Circuit looks at penalties after figuring out the framework is, in terms of the propriety of it, the courts here consider a number of factors. And those are known as the *Milan Group* factors as we explained in our briefing: the egregiousness of the misconduct, the level of scienter with which the defendant acted, whether the misconduct was recurrent or whether it was isolated, the risk of loss that was posed, and whether or not -- and this is the last one, which I'll devote a little bit more of a discussion to, but the last one is whether or not the penalty should be reduced because of the defendant's demonstrated current and future financial condition.

THE COURT: Can I just pause you for a second just to talk about the statute for a second. Each of the tiers in the statute says -- uses the words "shall not exceed the" and then it has an amount, obviously, each tier has an amount. So the

tiers essentially say if you're in Tier 3, the civil penalty shall not exceed whatever the amount of the Tier 3 penalty is. And if it was clear that you had a case where the statutory amounts were the highest possible amounts, and where you had a single and only one possible violation, so that you could not award under the statute more than the third tier number -- which is of course different depending on whether you're talking about an individual or a company.

But in any event, in that world, do you agree both that that is a cap on what the penalty could be, and then the question would be whether under *Milan Group* those factors point to a max penalty or something less? Do you agree with all that?

MR. COSTELLO: I think the maximum you're seeing in there, Your Honor, is the maximum number per violation.

THE COURT: I agree. That's why my hypothetical is assume it's a case where you know there is a single violation. Perhaps a single investor was defrauded one time by one person and it was a Tier 3 penalty situation. Then assume, again, hypothetically only one violation, the penalty would be maxed out at the tier number, but could be below that depending on the *Milan Group* analysis.

What I think -- what this has been very helpful to me is, the Commission's position I think is here there are ways that you could think of this case as involving much more than one

violation. If you hypothetically had a hundred violations, each such violation would carry with it the maximum tiered number, and the number would be extremely high, and you then have to think about perhaps the *Milan Group* factors in light of that. But the cap does maximum work -- I don't mean maximum cap, but when you have a single violation or -- it's a cap as to violation.

And I think here the Commission's view is where you have at least a lot of different ways to essentially have a higher cap, more violations and the like, the cap per violation serves as sort of a limiter in a way, but then it would be inappropriate from the Commission's perspective to use *Milan Group* to go down, because effectively you've taken off the table the higher numbers by saying we're only going to deal with two violations. Right? Is that all generally your position?

MR. COSTELLO: That's fair, Your Honor. I think the point that we're trying to make is that if the Court applies the *Milan Group* factors -- and we believe that the evidence in the record supports the application of those factors -- that the penalty proposals that we've made would fit with the analysis.

THE COURT: All right. Sorry, I paused you or distracted you from financial condition.

MR. COSTELLO: No, Your Honor. I was just going to

point out that when it comes to the *Milan Group* factors, all of the factors are taken together. So there's no one factor that is any more or less important than another. And all of the factors have to be considered together in that application.

Now, as we've set out in the briefing, we think all of the factors are met. The misconduct in this case took place for almost a five-year period. It was not isolated in that sense. There were approximately 800 to 900 participants or investors in this donation program. 4,800 equity share certificates were issued corresponding to 800 to 900 million common and preferred shares of Crystal World.

Some investors contributed multiple times and some -- actually the total aggregate contributions that they made exceeded $20,000. All of those investors, as I said earlier, are effectively out of pocket now because these shares have no value, because they are unregistered, they cannot be sold, they cannot be transferred, there is no active market for it.

But I would submit that perhaps the greatest reason why we believe that the penalty amounts we've proposed are justified is because of the level of egregiousness and scienter in this case. Scienter, as the Court knows from our briefing, can be either intentional wrongdoing or it can be extreme recklessness that goes beyond a should-have-known standard and presents a danger of misleading investors that the defendant

knows or reasonably should know.

We believe here that recklessness is established that would justify this level of scienter with which Mr. Rabalais acted. He deceived program participants into thinking that they were receiving a free gift of Crystal World Holdings equity shares, but in reality it was an illegal, unregistered securities offering.

He was warned repeatedly by his trusted advisors, one of whom told Mr. Rabalais that the donation program was nothing but a house of cards. And yet each time he was confronted he dismissed the concerns as nonsense, and "crap" I think was the term he used.

But he testified that he knew that selling unregistered securities was illegal, and he knew that he could not do that validly under the securities laws. He also told program participants repeatedly over the course of that period that registration would be done, that it would be happening soon, just hold on one more month, two more months. But he also said that he never had a plan in place to achieve that registration, and he knew that.

So we believe that the misconduct that he acted with here shows a high level of scienter and that would justify the amounts.

Now, when it comes to the companies, we believe that Mr. Rabalais's scienter is imputed onto the companies. And we

cited the Court to the case law that looks at this question of imputation not at the present day, because Mr. Rabalais is no longer at the helm of either of the companies, but imputation for these purposes is gauged by the relationship of the parties during the time in question. And during the time in question, Mr. Rabalais was the chief executive officer of Crystal World, the managing director of NSEI, he was the principal architect of the donation program, he controlled all of the accounts that the funds were received into, he was responsible for issuing all of the share certificates, he was responsible for sending out all of the emails.

I would also just point out, Your Honor, that I think that the case law would tell you that even though the current leadership of the companies may be well intentioned on this issue, and may not have any plans to engage in a violation like this again, I would just point the Court to the *Daly* decision here in the District of Columbia where the defendants made a similar argument.

The court rejected it, said that civil penalties on a maximum level were still necessary because, again, the purpose of the penalty is to penalize for past misconduct and, also importantly, to serve as a deterrent because there needs to be an understanding here that this type of behavior, this type of structure that the defendants perpetrated is illegal under the securities laws and there is no gray area or question about

it.

Now let me just address briefly the last factor, which is financial condition. And I just want to point out, just to be clear here, financial condition is one of the *Milan Group* factors as applicable to a penalty. But financial condition -- and we cited the cases to the Court -- does not play a role when it comes to disgorgement. So I just want to point that out preliminarily.

And also, under *Milan Group*, as the court used the language there, if financial condition is established, it is not a means to eliminate a penalty altogether, but merely to reduce it. When it comes to this financial condition, it is the defendant who has the burden, and the burden is to show both that the current financial condition and future financial condition shows an inability to pay. And the reason why the future aspect is there, Your Honor, is because while a defendant may not have the present means to satisfy a penalty judgment, the defendant subsequently may acquire the means to do so.

Now, when it comes to this condition or -- this financial condition factor as to the two sets of defendants, let's start with Mr. Rabalais. With Mr. Rabalais we can summarily dispose of that. This court entered a stipulated order, ECF 52, that says that Mr. Rabalais's financial condition will not be relevant for any purposes in the determination of these

proceedings. That stemmed from a discovery dispute --

THE COURT: I recall.

MR. COSTELLO: So I would say it would be disposed against him.

As for the companies, again, it is their burden to show that they do not have the present or the future inability to pay a penalty judgment. We'll start with the future. They argued in their briefing for the -- in the section involving *Govil* that the shares actually may have some value in the future because of what they term the goodwill of the ASM platform and the valuable IP portfolio.

Now, again, as we talked about earlier with *Govil*, that doesn't play a role in it, at least in the analysis, but I bring this up because it's relevant for purposes of financial condition. It is their burden to show that their future financial condition shows an inability to pay, and if they are correct in their argument and they truly believe that the goodwill and the value of this portfolio will at some point develop in the future, then they have not met their burden.

Now, when it comes to the present financial condition, the evidence shows that the companies have not sold any of the intellectual property or the trademarks or the patents to obtain any revenue, they have never had the portfolio professionally appraised. They did list one of the trademarks called "Own the Game" for sale in 2022 for just under

$200,000. They listed it for that. I don't believe it actually did sell at all. But there is testimony in the record that one of the representatives of the companies believes that that particular trademark actually might be worth around $1 million or so. He testified that he believes that personally.

And he also testified that at the time that they listed it for sale, apparently the trademark was being infringed or potentially infringed, and they reached out to a trademark attorney to send a demand letter, which to me, when there's trademark infringement -- and I'm not an expert in this field, but I think there's some value that goes with a potential trademark infringement.

And the representative also testified that "Own the Game" is not even a good trademark at all for the companies. So if they did sell it, they probably wouldn't miss it.

But if they believe that this portfolio is of such minimal present value, Your Honor, they could have engaged an expert during expert discovery in this case. They could have had the portfolio valued in order to support their view that they do not have the present inability to pay a judgment, because it is their burden, and *Milan Group* makes that clear.

And I would also just point out, speaking of *Milan Group*, Your Honor, that even *Milan Group* itself acknowledged that a harsh -- and that was the term the court used -- a harsh

penalty may still be necessary to reflect the seriousness of the violations even with a claimed inability to pay.

If the Court would like, I just would like to briefly address the survey results that were submitted.

THE COURT: Sure.

MR. COSTELLO: It's not entirely clear on whether the survey results are properly in the record. I know there was a surreply that was filed recently, and there was a minute entry, I think, but that minute entry may have been pertaining to a prior surreply that was filed.

But just on the survey results alone, this survey was done in, I believe it was February of this year, 2024, even though discovery closed in August of last year. And the survey asked the shareholders whether, 1, they would like to see Crystal World Holdings survive and move forward under new management; or 2, enter bankruptcy proceedings.

Now, according to the defendants' briefing on the statistics here, the survey was emailed to all 935 shareholders, but only 104 of them actually responded. That's by my math 11 percent, which means 831, or 89 percent, did not respond to the survey. 62 of the emails apparently bounced back, which means again, just doing basic math here, that 769 shareholders, or about 82 percent, received the survey but did not respond.

Of the 104 who did, 98 said they'd like to see the company

move forward and 5 voted for bankruptcy. And of course, we don't know what the almost 90 percent of the others feel about this.

But let's just put aside for a minute the untimeliness of the survey, the fact that it was conducted well after the close of fact discovery, and let's put aside the fact that we don't know what the other 90 percent of the shareholders think on this.

The defendants appear to be proffering the results of this survey not as against a civil penalty, because that's not one of the *Milan Group* factors, but they appear to be proffering this in support of their argument against disgorgement, which as they say is a remedy designed to make investors whole, and the preferences of those investors should be taken into account.

But as we talked about before, Your Honor, the SEC submits that that is not how disgorgement is looked at here in the D.C. Circuit. It is not to refund others for losses, but it is to deprive the wrongdoer of the unjust enrichment of his ill-gotten gain.

So frankly, candidly, Your Honor, despite the untimeliness of this survey, we submit it is really irrelevant to any of the issues before the Court.

THE COURT: Thank you, counsel. Ms. Stein.

MS. STEIN: Thank you, Your Honor.

Your Honor, to begin with the idea of the disgorgement amount, Mr. Costello said several times that the company is absolutely worthless, and that all the shares are worth nothing, which by the way is at great tension with something else they said in their brief, that the companies own IP worth millions of dollars. That's totally speculative. And one of the last points the SEC made was that the companies didn't engage any expert to assess the value of things.

The companies have had no income since 2019. They have absolutely no current assets. They had no ability to engage an expert to do anything. Certainly, the SEC could have. If there had been assets available, we would have tried that, but there's nothing. There's no bank accounts, there's no liquid assets at all. They have the platform, and they have the IP, and that's all they have access to, and that did not allow us to hire an expert.

It is certainly true that *Govil* is not binding in this circuit and that there is very little subsequent law on both *Govil* and even *Liu* because it's been a relatively brief period of time since *Liu* was decided, and other cases have to make their way through the system and hit the circuits before we can see them. So we certainly didn't argue in the briefs, Your Honor, that *Govil* is binding on Your Honor.

THE COURT: I know.

MS. STEIN: But it does have very persuasive reasoning

in it that I would urge Your Honor to accept and agree with.

In addition to which, Your Honor, one thing that seems to be missing both from the SEC's argument and entirely from its brief is an acknowledgement that this case sounds in equity and not at law. They have argued at great length what the statutes authorize, which of course is relevant. Obviously, Your Honor is bound by what the statute tells you. And we certainly didn't argue anything differently.

But equity is supposed to be about instituting fairness. The court has considerations at equity that cannot come up at law at all. When you're doing a case at law, you have to follow exactly the directives you have. But this is in equity, and the SEC has never at any point talked about fairness or -- and that's one of the reasons we gave Your Honor the survey.

First of all, we did want to know, as I said in my surreply, how the shareholders felt, because if they did not want us to proceed, then we would have stopped, because it's individual shareholders that have been paying my legal bills, and if people did not want to keep fighting it, the company was just going to give up because they're very interested in their shareholders.

There is a shareholder sitting in the courtroom now. There were four others who had made travel arrangements to come to the argument, but given the last-minute continuance, that

changed their schedule and they couldn't make it. But we have several people on Zoom because there is intense shareholder interest in this outcome because there is a strong belief in both the validity and the possibility of future success of the company.

So I'm actually going to address something Mr. Costello said near the end of his argument, which is that we haven't met the burden of proving that there's no future ability to pay civil penalties. Right now, liquid assets are zero.

If the Court imposes -- and I'm sorry, Your Honor, I don't mean this to sound like a threat at all, I'm just stating facts. If the Court imposes civil penalties and disgorgement anywhere near the level that the SEC is asking for, the companies will have no choice but to declare bankruptcy because they have no ability to pay that. And if they declare bankruptcy, presumably the IP will be sold and the trustee will distribute whatever accrues to those shareholders.

So it is certainly relevant in an equity action for the court to consider what the shareholders want, whether the shareholders want just to have the company liquidated so they can get whatever they want back on their shares. And that is what -- the other reason for which we did the survey, because we are concerned with the shareholders' interests and desires. And of course part of the mission statement of the SEC is to protect shareholders.

But nowhere in the SEC brief or in Mr. Costello's argument today did he say anything about what the shareholders want, what would benefit them, whether that should even be considered. And I submit that in an equity action it absolutely must be considered.

THE COURT: Do you think that if I concluded that the company received $1.8 million roughly in ill-gotten proceeds and, just hypothetically, also concluded that there was $1.8 million in proprietary loss by investors, that I nevertheless have the authority to order a disgorgement of less than that amount, exercising my equitable discretion?

MS. STEIN: I'm sorry, Your Honor. I'm not sure I understood the question.

THE COURT: So I don't think it's disputed that the company received about $1.8 million in proceeds from the program here.

MS. STEIN: Correct.

THE COURT: Let's assume hypothetically that that's exactly the same amount that investors lost, that their investments are worthless. So you have a perfect symmetry between gain to the company and loss to investors, $1.8 million. That would satisfy any argument about *Govil* and making sure that when we think about disgorgement that we cap it or at least that there's investor loss and the like. $1.8 million is both gain and loss.

Do you believe I would still have the power to order disgorgement of less than that amount?

MS. STEIN: Yes.

THE COURT: Because this is an action in equity?

MS. STEIN: Yes.

THE COURT: Okay. And if that's right, what would guide my thinking around disgorgement in that context?

MS. STEIN: Well, certainly the *Milan* factors are relevant.

THE COURT: I thought those were penalty factors.

MS. STEIN: Oh, I'm sorry, Your Honor. Yes, that's right.

THE COURT: I'm talking about disgorgement. I know I have to -- I very likely would need to take the $1.8 million and offset legitimate business expenses. But beyond that, let's say I do that, and let's say I conclude that at the end of the day, applying a correct offset -- I'm just throwing out a number for ease of the question -- I conclude that up to $1 million should be disgorged. Do you believe I could order less than that amount?

MS. STEIN: Yes, Your Honor.

THE COURT: Okay.

MS. STEIN: Certainly if you take the *Govil* approach. Because there is no quantifiable loss to the shareholders right now.

THE COURT: You're fighting my hypothetical. I just said -- the hypothetical is we know that investors lost $1.8 million.

MS. STEIN: Yes.

THE COURT: We know there's 1.8 million in gain. We do an offset and we're left with a disgorgement amount of a million dollars. Do you think I can order disgorgement of less than that amount?

Again, investors lost $1.8 million in my hypothetical. But you started out by saying this entire inquiry here is an inquiry about equity. Do I have the authority to order less than, in my hypothetical, $1 million of disgorgement because of some general notion of what's fair and equitable?

MS. STEIN: I think Your Honor has the authority to do that, yes.

THE COURT: What would guide my analysis there?

MS. STEIN: Well, equity in general, Your Honor, always talks about the broad discretion of the court. And one of the things that could guide Your Honor's decision there is that the shareholders want the company to go on.

And I'm sorry, before I forget to say this, and I will circle back in a moment, Mr. Costello kept talking about how it's only 11 percent of the shareholders who answered the survey. That 11 percent of individuals own more than 64 percent of the shares. So in a very real sense they are the

majority.

THE COURT: I'm not sure I needed a survey to tell me that you didn't want to roll over to the SEC. That's why we're here. I mean, you're taking your direction from the companies who are owned by someone and they're litigating these cases.

But in any event. So again back to my hypothetical. If I assume the hypothetical is right -- again, I realize it's got assumptions embedded in it -- I could award less than the million dollars in my hypothetical in part because the investors would like me not to.

MS. STEIN: Well, in part, but very small part, Your Honor. But more important it's that not forcing the companies into bankruptcy is the best way to reverse the losses by the shareholders. So Your Honor could certainly conclude I'm going to let the companies stay in business, because that's the only way the shareholders will ever recoup their losses. If they have to go into bankruptcy, it's likely -- I'm sure, Your Honor, that they wouldn't get but pennies on the dollar.

THE COURT: You mentioned that the company has -- is at least in very significant financial straits. I'll put it that way. Do you have a view -- I realize your position may be it's the SEC's burden to establish this, but do you have a view as to what the value of the investors' assets -- I mean -- or shares or whatever we want to call them, those

things that were procured with the $1.8 million, what the value of those is today?

MS. STEIN: No, Your Honor. Because the only assets the companies have now is the IP. And even Mr. Deihl and the other major investors have no idea -- we do not know how to evaluate IP, Your Honor. SEC mentioned they had listed an asset online, he said around $200,000. It's actually $199,000. And they received zero offers. So they did attempt to raise some money and it didn't work.

And what is missing from the SEC's presentation is if they have to -- the companies were criticized during his argument for not having sold IP to generate revenue. If they sell their IP, there's no business, because the ASM platform is the business, and if they lose control of that, they have nothing. That is exactly what the business is based on.

So they cannot -- it's like saying, you know, a taxi fleet owner should sell all his cars in order to meet the disgorgement amount. If he does that, he can't give people rides anymore. If they sell IP, they have nothing. The IP is exactly what they're offering their investors and possible future clients.

So I don't even think so much that it's a burden-shifting issue. That's not what I'm resting my argument on, that it's burden-shifting. It's that the only way the investors can recoup their losses is for the company to be in business. If

they sell their IP, they can't be in business.

And the SEC said that ASM is separate and it shouldn't be considered. There's no way to divide them. That's an artificial separation. NSEI has always administered ASM. The point of the donation program was to -- was folded back into ASM and to pay normal business interest -- expenses. Excuse me. Everything was put back into the business. So there is no way to divide them.

ASM was set up by the companies in order to give the service to the people who wanted to sign up. And the money from the donation program was used to pay ordinary business expenses like rent and phone bills and stuff like that, and also to put back into the ASM platform.

And there's one other thing that SEC's argument belies, which is, for example, when we look at the expenses, the marketing expenses, their argument is that you can't deduct -- you can't offset marketing expenses because that's just money that's used to perpetrate the fraud. And what the SEC is not paying attention to is that the business itself was not fraudulent, the fraud was the nonregistration.

And every case that they cite to support that are all -- the business expense section of their brief, all the cases they cite that say no, that wasn't an allowable offset, are for companies that were not doing a legitimate business. They took money to do something completely different from what they

were saying to the shareholders they were going to do. So the business itself was a fraud.

In this case the only fraud is the nonregistration. Now, I'm not trying to make light of that, Your Honor.

THE COURT: I understand.

MS. STEIN: It's illegal, and that's why we entered into the partial judgment, because it was wrong and there are legal penalties for that. But the business was actually doing exactly what it told the investors it was going to do. It was -- things like setting up meet and greets and parties like that, it's not frivolous. That's the way in this kind of business you spread awareness and you --

THE COURT: Do you agree with the following, which is, just hypothetically, if Mr. Rabalais went to a conference in L.A., or pick your place, Chicago, make it easier, I guess -- went to a conference in Chicago and was there to talk about and advocate for and be -- you know, essentially try to get the word out about ASM, and that's all he did. And he was just out there trying to make ASM look like the greatest thing since sliced bread. That's one world.

Another world is Mr. Rabalais -- and he incurs a set of expenses, flights and dinners and hotels, but it's about this conference. Maybe even a fee to attend the conference or something like that.

Alternatively, he goes to Chicago, he meets with a group of

wealthy investors, and the whole point of the meeting is to try to get them to invest through the scheme that is now -- the companies have agreed was unlawful.

Do you agree that those expenses — the flight to Chicago, the dinner with the wealthy investors, whatever, that is crystal clear linked to actually an ask to invest — would not be subject to offset?

MS. STEIN: Would I say that's not subject to offset?

THE COURT: Yeah.

MS. STEIN: No.

THE COURT: That's a legitimate business expense nevertheless?

MS. STEIN: Yes.

THE COURT: Even though the whole point of the trip is to go to sell investors on this specific investment that's unlawful?

MS. STEIN: If it was crystal clear that that was all that was going on, then --

THE COURT: Yeah. Again, it is my hypothetical.

MS. STEIN: It certainly would be a close question, Your Honor. I don't think it's clearly not -- well, again, because -- the cases relied on by the SEC are people marketing something that they were not -- they were selling a lie, a fraud, and --

THE COURT: Well, there's conduct here that's unlawful.

MS. STEIN: Yes.

THE COURT: It's concededly unlawful now.

MS. STEIN: Yes.

THE COURT: Surely some more than zero dollars of expenses were incurred in procuring the unlawful investments.

MS. STEIN: Yes.

THE COURT: Okay. So then it's just a question of how closely tethered to the unlawful investments are the expenses. You know, on the one hand a trip wholly to market ASM, you would say clearly not tethered enough, the SEC would say it is. There have to be some expenses that would not be subject to offset because they're so closely linked to the unlawful conduct. Right?

MS. STEIN: Yes, Your Honor.

THE COURT: So what's the line?

MS. STEIN: Well, I don't think it's a line that can be defined. It's a fact-based inquiry that has --

THE COURT: And isn't it your burden -- doesn't the burden shift to you to show legitimate business expense offsets?

MS. STEIN: Well, Your Honor, I'm certainly aware of the case law that says once the SEC has made a reasonable calculation of the expenses, then the burden shifts to the defendant. But our position is they did not make a reasonable -- by rejecting all of the marketing expenses, it

shows they didn't pay -- they did not even attempt to pay any attention to how closely related certain expenses were. They just said, no, you wanted to get new investors, so you don't get to deduct any expenses.

And just as I agree with Your Honor that there must have been some money expended to get people to invest, certainly there must have been money expended that was used for something closely related, and the SEC has made no effort to distinguish among the expenses; they just disallowed them by a category. They just looked at the name of the category and decided, no, that's not allowed.

So my position, the defendants' position is that that is not a reasonable approximation that shifts the burden to us.

THE COURT: Okay. So let's now go to charitable contributions, that category. I think the SEC's position is different, which is those aren't really tied to the business of ASM or the companies, and so they aren't really in the same way subject to offsets, for a different reason really.

So why don't those contributions fall out? It seems odd to me that a company would say, hey, we're making all these contributions to charities that aren't really very related to our business, and we nevertheless get to offset the disgorgement amount by that amount, by the charitable contribution amount.

MS. STEIN: Well, Your Honor, there doesn't seem to be

much law on this subject, and certainly I agree that those contributions were not related to the business of CWH or NSEI. I found that Fifth Circuit case where the Fifth Circuit was not concerned by that. They said they really gave the money, it really was a charitable entity that they gave it to, and therefore it can be deducted. And in that case there was also no connection at all between the business and the place that got the money.

There does not really seem to be clear instructions in the case law about this. So I think it's a difficult question. And as I said, we concede that they were not related, but they really were charitable contributions. I think that part of the reasoning for it was just that since NSEI is a nonprofit and they do want to do outreach into communities and improve financial literacy and things like that, that perhaps just giving to other charities creates a network, people they can work with, people they can refer back and forth. I agree that it's a little vague, Your Honor, but I have not seen any case law that says charitable contributions cannot be deducted unless they're related to the business.

THE COURT: Okay. What about the other two categories that the Commission thinks aren't really disputed, which are the --

MS. STEIN: Mr. Rabalais's salary.

THE COURT: Yeah.

MS. STEIN: And about $16,000 in -- no. That's why I conceded it in the brief.

THE COURT: I just wanted to make sure.

MS. STEIN: I did not have any documentation for that $16,000. That's on us. So we pay for own mistake.

As to Mr. Rabalais -- and this is a nice segue into what I wanted to get into next anyway, so thank you, Your Honor -- I agree, Your Honor, the defendants agree that Mr. Rabalais's salary that he paid to himself, which was certainly not excessive, I mean, he was not paying himself an exorbitant amount of money. A little over $200,000 over the course of five years is not exactly milking the corporation.

But because he was engaged in fraudulent activity throughout, because he refused all of the suggestions from all of the other major shareholders and members of the board of directors to comply with the law, defendants take the position that that's not a legitimate business expense, that paying someone to commit fraud is not what the law contemplates and that cannot be offset from the amount. We're somewhat pained to have to concede that, Your Honor, but we concede it nonetheless.

Mr. Rabalais throughout was engaged in the fraudulent activity of not registering shares. His contempt for the entire legal system could not be clearer, starting with the -- you know, there were all those statements in his reply brief

about --

THE COURT: I saw them.

MS. STEIN: Yeah. And all of the statements from the emails that I included in my brief and in the emails that were in the SEC's appendix, and then of course his not showing up today. He could not -- after getting permission to appear remotely, he doesn't even do that. He clearly has nothing but contempt for the law.

And Mr. Ozgit and Paul Bleier and Mr. Sethness, who is present in the front row of the courtroom, you saw those chains of emails, Your Honor. They went on for years. Get a lawyer, get a lawyer, we need to register these. Mr. Ozgit is saying: I really think these are shares, I really think they need to be registered.

I mean, everyone else was trying as hard as they could. And Mr. Rabalais kept stringing them along by saying oh, yeah, I'm working on it, it's going to happen really soon, sending out mass emails to all the investors, registration is coming any minute, when he clearly had no intention ever of registering them, despite the begging and pleading being done by other people involved in the company.

And when they could not get him to do the right thing, they just got rid of him and put Mr. Deihl in instead. And that is why I argued that certainly on the penalties they should not apply to the companies but only to Mr. Rabalais.

Oh, by the way, the SEC made one point in its brief. I agree that whatever disgorgement the Court orders should be joint and several. I think the law is clear that it's supposed to be joint and several.

And also in terms of the penalties, we've been discussing the *Milan* factors, and one of them is whether the penalty should be reduced due to demonstrated current and future financial conditions. That is -- the current financial condition is they have nothing. They have nothing. And they cannot open up any other kind of business because with the pendency of this case, banks wouldn't deal with them, they couldn't get any loans.

They tried very hard. Mr. Deihl made numerous efforts to get lines of credit, to open up accounts, and understandably, Your Honor, when a bank does its due diligence and finds out that there's a pending SEC enforcement action -- or I'm sorry, civil suit seeking lots of money, obviously, no sane banker would agree to work with them or give them any money. So it's not like they've just been sitting around waiting to win this case.

They've been trying to make things move forward, and it was impossible while the case was pending. And it has been pending for an exceptionally long period of time for many reasons that are outside the parties' control, such as the pandemic, and then my predecessor counsel becoming so ill that

he had to stop working on any trial cases, and then my having to get up to speed jumping into the case so late. So in all that time, there have been efforts made to try to keep the business going, and it's been absolutely impossible.

And there is no way that the companies will ever acquire the ability to pay unless they're allowed to remain in business. And if Your Honor imposes the penalties and disgorgement that the SEC's asking for, they will not be able to stay in business, which I think is unfortunate both from the point of view of the investors, and also because it's a very interesting idea that I think could contribute nicely to the marketplace. And we'd like to be able to do that.

THE COURT: Let me just go back for one second to disgorgement. I clearly understand your arguments on the penalties and the like. At least the way the SEC thinks about it is -- and I think -- these are just numbers, right, there's about $1.8 million in proceeds, there's, you know, something like $636,000 in legitimate offset, and the net of that -- again, before prejudgment interest or anything, is $1.169 million. So that's the SEC's view of net profit, I'll put it that way. That's the disgorgement amount.

To the extent that there's a requirement that disgorgement be capped by pecuniary loss to investors -- here the investors gave the companies and Rabalais $1.8 million -- is there any real argument that those -- what they got in return for $1.8

million is worth more than $700,000 now? In other words, the SEC's asking for disgorgement of, we'll call it $1.1 million, which means -- is there any argument that the investors lost really a not very significant amount, or that their investments aren't worth very much, so that the cap from any proprietary loss to investors would do some work there? Do you understand my question?

MS. STEIN: No, I'm sorry, I don't, Your Honor.

THE COURT: So the SEC isn't actually asking for disgorgement of $1.8 million. They're asking for disgorgement of $1.15 million.

MS. STEIN: Right.

THE COURT: Okay? So it seems to me that a way of thinking about it is you say, well, did the investors lose at least that much? At least 1.15 million? Okay? They would have if their $1.8 million investment was now worth less than approximately $700,000. Is there any serious argument that their original investment is worth more currently than $700,000?

MS. STEIN: No. There is no -- to me that's an unanswerable question because the IP assets have not been evaluated and that would be the total worth of the company now, given the fact that there's no income.

THE COURT: So, I mean, obviously no one -- the record doesn't reflect that anyone attempted to value the

investors' -- the value of what the investors got for $1.8 million at present value. Right?

MS. STEIN: Yes.

THE COURT: So I'm left with this argument that I need to care about loss to investors, but no one has attempted to tell me what that loss is.

MS. STEIN: Certainly we have not, Your Honor, for the simple reason that we could not afford an expert. But of course plaintiffs didn't do it either, and they could have hired someone. I know the SEC isn't bankrupt.

THE COURT: No, no, I know. And the SEC's argument is there is no such cap for investor losses or proprietary losses by investors so we didn't have to. You say there is such a cap. My question is whether that cap actually would do any work here. In other words, how plausible is it to think that the value of what was purchased for $1.8 million is worth presently more than $700,000.

MS. STEIN: Your Honor, I would love to be able to answer that in detail, but because of the unknown value of the IP assets, I cannot. And I don't want to make something up. I will say that there is this incredible tension in the SEC's argument, because they keep saying that the shares are worth nothing --

THE COURT: No, I know there's tension in both sides' arguments. If on the one hand the shares are worth nothing

and so the investor losses are 100 percent, then that means the company doesn't have a lot of ability to pay. If, on the other hand, the investors didn't lose much so that the cap that you say applies to disgorgement does a lot of work, then that means that the company has some value and does have the ability to pay. There's tension in both positions.

MS. STEIN: I'd like to respectfully disagree with that last part, Your Honor.

THE COURT: Okay.

MS. STEIN: Because we do not know the value. It's not that -- we're not contradicting ourselves. The SEC says on the one hand that the shares are worth nothing, and on the other, they have millions in IP. We are saying that currently the shares are not worth anything, but if allowed to continue in business, they will be worth a lot. And if we're not allowed to continue in business --

THE COURT: Well, we don't know how much.

MS. STEIN: No. We don't know how much, Your Honor.

THE COURT: And because we don't know how much, you say there's no ability to pay for purposes of remedy -- civil penalty. So you're not saying -- the implication is at present the company isn't worth very much because if it was it would have the ability to pay.

MS. STEIN: Right.

THE COURT: But if it's not worth very much now, that

means the investors lost a lot of money from the get-go, which means that for disgorgement purposes the cap on investor losses doesn't do very much work.

MS. STEIN: No. That's correct, Your Honor. But my position is you shouldn't just look at what it's worth today in terms of liquid assets, because it's worth something. If they stay in business, they will start generating revenue again and then it will be worth something. If they go into bankruptcy, their IP assets will be sold and something will be distributed.

So I think it's very clear that the current value of the shares is not nothing. And the fact that they can't be registered -- well, they can be registered or new shares can be issued, properly registered, that would give everybody the same stake that they have in it now.

Now, as to Your Honor's question about whether it might be worth more than $700,000, that is the speculative part, and I have no way to evaluate that.

THE COURT: Fair.

MS. STEIN: We thought that that one piece of IP was worth $199,000, and nobody even responded to the ad. But if allowed to continue in business, they could go back to marketing to spread awareness of the business, and then more shareholders would come in and would pay. So I think it's very clear that the value is not zero and it's not a hundred

percent loss to the investors.

THE COURT: Can I ask you -- this is a small point but just to make sure I understand the parties' respective positions. Obviously, I understand all the arguments about civil penalty, not doing it and the like. But just about Tier 3, do you concede that the preconditions for being in Tier 3 are met here?

MS. STEIN: No, Your Honor.

THE COURT: Okay. Is that because your view is the fraud did not involve fraud, deceit, manipulation or deliberate or reckless disregard --

MS. STEIN: I'm sorry, I'm having trouble understanding Your Honor.

THE COURT: So the third tier is triggered if (c)(1) and (2) are met. Which of those two do you believe is not met here?

MS. STEIN: I'm sorry. Can I look at --

THE COURT: So it says notwithstanding the prior paragraphs, you're in the third tier if (1) the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement, and (2) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

MS. STEIN: I think this case does not meet the second

criterion.

THE COURT: Okay. Why not?

MS. STEIN: Because it did not create the risk of a business loss. I mean, the loss now will be from this proceeding. I don't think that that's what the statute means or the cases interpreting it. It's when the activity itself, when we're talking about like a Theranos, that everything they did was calculated to get money away from people and no chance of their ever recouping it.

Again, this gets me back to the business itself was not fraudulent and the only risk of loss that the nonregistration occasioned was the risk of an SEC enforcement action and being assessed penalties and disgorgement. I understand the statute to refer to creating a great risk of loss what the business is actually doing, the substantive part of the business.

THE COURT: Is it? It says "such violation." Here the violation is the sale of unregistered securities. Why didn't the sale of unregistered securities directly or indirectly result in substantial losses -- that is the inability to have marketable equity investments -- or create a significant risk of substantial losses to other persons?

MS. STEIN: Well, on one level it did, Your Honor, but I understand the statute and the way it's been interpreted by the case law to mean what they were doing with the business. That what they were doing was to take money away from people

without offering them really any opportunity of getting it back or realizing a profit on it. Otherwise, every single violation would be Tier 3, because every time you violate the securities law, you're creating a risk that there could be substantial penalties imposed.

So with respect, Your Honor, I think that argument proves too much because then what would be the differences among Tiers 1, 2, and 3?

THE COURT: Well, there may be violations of securities laws that don't make a security as unmarketable as here, or something else. I mean, these tiers apply to all different kinds of violations under the -- the relevant acts, and I'm no securities expert but I suspect that there are categories of violations that don't run the same risk of significant pecuniary loss.

MS. STEIN: Well, there are certainly some forms of noncompliance with the law that do not create that risk, but not the entire category. There are many frauds that fit within the first tier that do create such a risk. So -- because it covers any kind of violations of securities statutes.

Now, in a given case, looking at the facts, one might conclude that in this particular case it didn't do that, but if anytime you violate the law, that creates a risk, which is most securities fraud cases is my position, although I don't

have data on that -- I think most of the cases involve at least an indirect risk of loss. So if that's the way we look at it, I don't see how every case doesn't fall into Tier 3.

THE COURT: Okay. Thank you. Anything else you'd like to add, Ms. Stein?

MS. STEIN: Just briefly about Mr. Rabalais, Your Honor. You know, we've conceded there's certainly some amount of disgorgement that should be imposed on the companies, and we've conceded some of it --

THE COURT: Have you?

MS. STEIN: Well, yeah. Haven't I?

THE COURT: No, I thought your view was any amount of disgorgement is capped by the loss to investors, the SEC hasn't proven that amount, therefore disgorgement is zero.

MS. STEIN: Yes. I'm sorry. I misspoke. I meant to say some of the expenses we have conceded are not legitimate.

THE COURT: Okay.

MS. STEIN: I just misspoke. Some of the expenses are not legitimate offset.

I would like to briefly discuss the penalty part if I may get back to the *Milan* factors. So the SEC has paid no attention to the factor of the current financial condition of the companies. And we do not dispute -- this is not a case of piercing the corporate veil or imputing scienter. This was largely a one-man band for a long time. Obviously, whatever

Mr. Rabalais knew, the corporations knew. I wouldn't insult Your Honor's intelligence by saying anything different. There's no nonfrivolous argument to be made that the scienter can't be imputed.

But again, because this is equity and Your Honor's supposed to look at the egregiousness of the defendant's conduct, whether it created substantial losses, and whether the penalty should be reduced due to demonstrated current and future financial condition, and the SEC has not addressed that at all.

If all the shares were worthless, they have not said, well, that certainly should result in a decrease in the penalties. This is a very unusual case, I would submit, Your Honor, as shown by those emails that the government -- I'm sorry, the SEC included.

THE COURT: They're still the government. I understand what you mean. They're an independent litigating authority commission, but they're still the government.

MS. STEIN: I do a lot of criminal defense, Your Honor. I'm just used to saying "the government."

But the SEC has not addressed that at all. Mr. Rabalais was just out of control and he got more and more out of control as time went on. And you've seen those emails with other members of the board of directors, the major shareholders, many of whom are on Zoom right now, saying please, please, this is not the way to do it. Hire a

securities lawyer. Please register. I think you're doing it wrong. This is terrible. We're going to get in big-time trouble.

And he just kept blowing them off. It was a combination of ignoring them, criticizing them, and lying to them. That's all he kept doing. And lying to the shareholders. And it eventually reached the point where the people who did own the majority of the shares said yeah, we gotta change course. And that's what they're trying to do now.

And again, because it's equity, Your Honor, I think you can also consider that this seems to be a very interesting idea and could create a nice marketplace and might actually help with raising financial literacy, and that it's a worthwhile project.

I found it interesting, I included a reference to the *Theranos* case in my brief, and the only information I have on that is the SEC press release when they settled the case, but I have to assume that's accurate. There was no civil penalties imposed on Theranos itself because -- I'm sorry, I forget the name -- Elizabeth Holmes and her boyfriend were just lying to everybody, and out of control and not taking advice from anyone. And that's what was going on here too.

Again, I mean, that entire business was fraudulent. But here Mr. Rabalais just kept lying and lying and lying: I'm going to do it, I'm going to do it, I'm going to do it. And

for a long time they trusted him, and then they started prodding him and pushing him. And when they could not succeed, they finally got a different CEO.

And given what a good idea this company is, and given that they do seem to have valuable IP, although I can't quantify the value, I suggest that everyone wins if they can stay in business. The shareholders have a chance to make profits, they're interested in that, and a service will be provided that I think will help a lot of people.

THE COURT: Thank you, counsel.

Mr. Costello, brief -- maybe even very brief -- rebuttal.

MR. COSTELLO: Your Honor, just briefly, I think it might help for the record to be clear when it comes to the different tiers that we're talking about here for purposes of the penalty, there's Tier 1, which is used for any violation of the securities laws at all, whether it involves fraud or not. Then there's Tier 2, which is a violation of the securities laws that involves fraud and also a reckless disregard of a regulatory requirement like the registration requirement that's involved here.

And then there's Tier 3, which again is something that involves fraud and/or a reckless disregard of a regulatory requirement, and the --

THE COURT: The risk or actual.

MR. COSTELLO: Loss, correct, Your Honor. So I just

want to be clear that what we're talking about here, it's the violation that is the question, not the business itself, not the structure of the business, but the violation. And the violations that we've charged here, which were established for purposes of today, are a violation of Section 5 and a violation of Section 17, which is a fraud statute. So we would submit that the third tier is the operative tier to use.

And when it comes to posing the risk of loss, I think we've talked a lot today about the fact that there was loss no matter how you slice it. So I think the third tier is satisfied.

And I'd just also briefly like to address, Your Honor, this concept of when it comes to assessing penalties against both the individual and the company, this wouldn't be the first time that this court -- that a court here would do that. I would just refer the Court to the *Lesak* case and to the *e-Smart Technologies* case, both here in this district, where that exact thing was done because the circumstances were such that given the relationship between the individual and the companies, it was merited.

And just one final thing about the SEC's settlement with Elizabeth Holmes. That was, again, as its name suggests, that was a settlement. That was a settlement that was agreed to by the parties. That is just not at issue here.

THE COURT: Thank you. Ms. Stein, anything you'd like

to add?

MS. STEIN: No, Your Honor.

THE COURT: So thank you all. I'm going to take the questions under advisement. My plan at present is to essentially write an opinion or at least an order that would deal with all of the relief that the SEC seeks, and to resolve all of that without the need for further argument or in particular the need for any evidentiary hearing, with testimony and the like.

If for whatever reason it turns out not to be the case that I can do that, I'll contact the parties and we'll schedule a hearing, but at present I don't believe that's going to be necessary.

So unless plans change, the next time you hear from me will be through an order or an opinion or something like that that essentially is my view on the various categories of relief that the SEC is presently seeking. So absent anything else, the issues are taken under advisement.

Thank you all.

(Proceedings adjourned at 11:43 a.m.)

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne