**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

SECURITIES AND EXCHANGE
COMMISSION,

         *Plaintiff*,

    v.

CRYSTAL WORLD HOLDINGS, INC., et
al.,

         *Defendants*.

---

Civil Action No. 1:19-cv-02490 (CJN)

**MEMORANDUM OPINION**

Defendants Christopher Rabalais, Crystal World Holdings, and New Sports Economy Institute agreed with the Securities and Exchange Commission that they committed violations of §§ 5 and 17(a) of the Securities Act, 15 U.S.C. § 77e, 77q(a), and consented to entry of a judgment on liability, which the Court entered last year.  ECF 65.  The Parties could not, however, agree on the amounts of disgorgement or civil penalties, if any, that should be awarded for Defendants' violations.  The Commission accordingly has moved for entry of final judgment, *see*, ECF No. 66, which the Court grants in part for the reasons that follow.

**I.    Background**

Christopher Rabalais was the CEO and sole officer of Crystal World Holdings, a for-profit company, and the managing director of the New Sports Economy Institute (NSEI), a non-profit company.  ECF 66-1 at 1.  Rabalais exercised *de facto* control of both, overseeing all hiring, promotion, and firing decisions.  *Id.*  By and through these companies, Rabalais created something called the "AllSportsMarket" platform, which was described as an "experimental marketplace" that allowed users to buy and trade "virtual" interests in sports franchises.  *Id.* at 3.  Crystal World

was the holding company and owner of all intellectual property associated with AllSportsMarket; NSEI, in turn, operated the platform pursuant to a licensing agreement with Crystal World. *Id.*

Rabalais developed multiple methods to fund the AllSportsMarket platform; relevant here is the so-called "donation program." It worked like this: Investors would donate money to NSEI and receive, in turn, "free" equity shares in Crystal World. *Id.* at 5. Between 2014 and 2019, Rabalais and the companies promoted this program through social media blitzes, TV interviews, and thousands of email solicitations—leading to "thousands and thousands" of donations. *Id.* at 9. And, to be sure, those "donors" received their "free" Crystal World shares. The problem was that Rabalais hadn't yet registered those shares with the Commission, and thus the holders of the shares couldn't trade them on the open market. Rabalais made numerous representations to donors that he would register the shares "soon," *id.* at 10–11, but as time went on and the shares remained unregistered, donors expressed concerns—as did Rabalais's colleagues and subordinates at Crystal World and NSEI. ECF 66-1 at 10–14. But the authority to register the shares rested with Rabalais, and he gave repeated assurances that he would do so on some vague time horizon; his typical refrain was "next year." *Id.* at 12–13.

"Next year" never came. Even today, the shares remain unregistered. In 2019, the Commission brought this action against Rabalais, Crystal World and NSEI for securities fraud. After years of litigation not particularly relevant here, in late 2023, all three Defendants consented to the entry of partial judgment against them for having violated §§ 5 and 17(a) of the Securities Act. 15 U.S.C. § 77e, 77q(a); ECF 57-3 at 1–2. The Court entered those judgments on February 20, 2024. ECF 64, 65.

As noted above, the Parties could not agree on the amounts of disgorgement or civil penalties, if any, and thus left those issues to be decided by the Court. In its Motion for Entry of Final Judgment, the Commission seeks disgorgement and prejudgment interest of $1,468,556

against all Defendants, jointly and severally, as well as the following civil penalties:  $446,458 against Rabalais, $1,116,140 against Crystal World, and $1,116,140 against NSEI.  ECF 66 at 1. Perhaps not surprisingly, all Defendants argue that the Court should order substantially less disgorgement (if any) and impose no civil penalties.

One final note:  Although largely immobilized by this litigation, Crystal World and NSEI remain operational companies and have forced Rabalais out of the picture.  *Id.* at 23; ECF 78 at 5–6. And it remains at least *feasible* that the ASM platform could someday turn a profit—and thus that the shares, if registered, could be of value.

## II.    Analysis

### A. Disgorgement

The Commission argues that the Court can (and should) order disgorgement in an amount equal to the value of Defendants' ill-gotten goods or gains.  ECF 66 at 6.  It is undisputed that Defendants raised $1,805,274.93 in total proceeds from the donation program.  But some of those proceeds were spent on legitimate business expenses, which the Commission acknowledges should be offset against the amount of total proceeds.  Other expenses, the Commission contends, were not legitimate business expenses and therefore should not be offset.  All told, the Commission calculates that $636,236 of the proceeds were used for legitimate business expenses and thus can be offset against the total proceeds—leaving the Commission to seek a total disgorgement order of $1,468,556.93 (inclusive of pre-judgment interest).  *See generally* ECF 66 at 17.

Defendants have a much different view.  Relying primarily on *Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71 (2020), and *Sec. & Exch. Comm'n v. Govil*, 86 F.4th 89 (2d Cir. 2023), they contend that disgorgement is an equitable remedy designed *only* to rectify "pecuniary harm"—that is, financial losses suffered by specific victims.  ECF 81 at 18.  Insisting that the donors still hold shares that may someday prove valuable, or at a minimum that the Commission has failed to

3

establish the specific amount of loss suffered by donors, Defendants argue that the Commission has failed to establish any amount of pecuniary harm that disgorgement would remedy, and thus that no disgorgement is warranted at all.  ECF 78 at 19.  In the alternative, Defendants argue that the Commission is incorrect about the legitimacy of many of their business expenses, and thus that substantially more should be deducted from their gross proceeds before arriving at a disgorgement amount.  *Id.*

As to the question of whether disgorgement under the Securities Act is limited to the pecuniary losses of victims, the Court recognizes that other circuits (most notably the Second Circuit) have recently answered in the affirmative.  *See, e.g.*, *Govil*, 86 F.4th at 94 ("One of the equitable limitations identified in *Liu* is that disgorgement must be 'awarded for victims.'… Because a defrauded investor is not a 'victim' for equitable purposes if he suffered no pecuniary harm, the district court needed to determine that the investors Govil defrauded suffered pecuniary harm before awarding disgorgement.").  In *Zacharias v. SEC*, 569 F.3d 458 (D.C. Cir. 2009), however, the Court of Appeals held that harm "to third parties may be a useful measure of a violator's wrongdoing.  *But whether… securities violations injured others is irrelevant to the question whether disgorgement is appropriate*."  569 F.3d  at 471 (emphasis added).[1]

_____

[1] The Court recognizes that the statutory basis for a disgorgement award has changed over time.  Before 2021, 15 U.S.C. § 78u(d), did not mention disgorgement at all; instead, § 78u(d)(5) authorized the award of "any equitable relief."  In *Liu v. SEC*, 591 U.S. 71 at 75, 87 (2020), the Supreme Court held that disgorgement counted as "equitable relief"—but with the caveat "absent other indication, [it must] be deemed to contain the limitations upon its availability that equity typically imposes."

Following *Liu*, in 2021, Congress added § 78u(d)(7) to that statute—and that provision now expressly provides that "in any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."  What, then, happened to § 78u(d)(5)?  Had Congress removed disgorgement as a kind of "equitable relief" authorized by it?  Or does the statute now authorize *two* types of disgorgement—"equitable" disgorgement under § 78u(d)(5), and some other undefined breed of disgorgement under § 78u(d)(7).

The better view is likely that expressed by the Second Circuit in *SEC v. Ahmed*:  that § 78u(d)(7) is merely a "belt and suspenders clarification" of a specific remedy that already exists in § 78u(d)(5).  72 F.4th at 396.  Ultimately, however, the Court need not answer this (or other related questions) here because, at least until the Court of Appeals

To be sure, in *Liu*, the Court held that disgorgement is "restrict[ed] . . . to an individual wrongdoer's net profits to be awarded for *victims.*"  591 U.S. at 79.  That means the Second Circuit's recent decisions have some force.  But until the Court of Appeals reconsiders *Zacharias*, in this circuit, the law is that the amount of pecuniary harm to victims does not cap the amount of disgorgement that can be awarded against a wrongdoer.  Accordingly, pecuniary harm is probative—but not dispositive—of the disgorgement inquiry.  And in this case, it is difficult to treat such harm as significantly probative when the current value of the donors' "shares" is quite speculative.  Instead, another equitable principle, also recognized by the Court in *Liu*, is relevant: disgorgement resides "squarely in the heartland of equity" when it "simply restores the status quo." *Liu*, 591 U.S at 80–81.  The status quo here is the state preceding the exchange of donations for any unregistered securities.  Rabalais registered none of the securities, and the donations exchanged for them was $1,805,274.93.  Requiring disgorgement of that amount would, at least in one sense, restore the status quo—and thus marks the upper bound of disgorgement.

Again, however, the Commission isn't asking for that amount.  Instead, consistent with the statement in *Liu* that "a defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement," 591 U.S. at 91, the Commission argues that $636,236 represents the amount of Defendants' legitimate business expenses that can be deducted.  Defendants, not surprisingly, argue for a larger deduction of $1,539,258.  These different positions turn on two categories of expenses:  $733,488 of "promotional and marketing expenses," and $169,534 "charitable expenses."  ECF 85 at 17.  Each in turn.

As for "promotional and marketing expenses," Defendants note that the ASM platform was not, itself, fraudulent.  Nor were the other fundraising methods the companies utilized—only the

---

reconsiders *Zacharias*, the Court is bound to apply it for the reasons discussed in the text.

donation program.  Accordingly, Defendants argue, only marketing expenses specifically related to the donation program should be included.  ECF 78 at 19–20.  That argument has some merit; after all, there's a difference between erecting a billboard with the ASM logo on it, on the one hand, and taking specific investors out to dinner to convince them to donate money for unregistered shares. But Defendants do not specify which promotional expenses fell into the former camp and which into the latter.  And the Court of Appeals has held that once the Commission has established a reasonable approximation of the disgorgable net proceeds—as it has here—the burden shifts to the defendant to demonstrate how and why that approximation is inappropriate. *Zacharias,* 569 F.3d at 473.  That allocation of burdens makes sense, as a defendant is in the best position to explain and qualify its various expenses.  But Defendants have failed to satisfy their burden of demonstrating that promotional expenses should be divided more precisely.

The category of "charitable expenses," in turn, refers to donations Defendants made to charities such as World Vision, the American Red Cross, and the World Food Program.  ECF 66 at 11.  Relying on *Liu,* see 591 U.S. at 92, the Commission argues that these contributions should not be offset because there is no nexus between them and the corporate mission.  ECF 78 at 20–21. Here, again, the burden shifted to Defendants to demonstrate how and why the Commission's approximation is inappropriate; and here again, Defendants have failed to demonstrate a nexus— such as by proving that the companies' charitable donations were calculated to boost the ASM brand.

In sum, then, the Court orders disgorgement (and prejudgment interest) against each of the Defendants, jointly and severally, in the amount sought by the Commission:  $1,468,556.93.

**B.  Civil Penalties**

Civil penalties are discretionary under the Securities Act; the Commission "may bring an action… to seek" them and the Court "shall have jurisdiction to impose" them.  15 U.S.C. §

77t(d)(1).  That broad grant of discretion is cabined only by § 77t(d)(2)'s "tiers" of maximum penalties.  There are three tiers, and each has the same structure:  "[T]he amount of penalty for each [Securities Act] violation shall not exceed the greater of [X amount] for a natural person or [Y amount] for any other person, or… the gross amount of pecuniary gain to such defendant as a result of the violation."  15 U.S.C. § 77t(d)(2)(A)–(C).  Those maximum amounts increase with each tier, with each tier representing a more serious form of violation.   At Tier 3 the current maximum statutory amounts per violation are $223,229 (for Rabalais as a natural person) and $1,116,140 (for the companies).  *See* 15 U.S.C. § 77t(d)(2)(C); 17 C.F.R. § 201.1001.

Note that these penalties may be awarded "for each [Securities Act] violation."  15 U.S.C. § 77t(d)(2)(A)–(C).  Defendants' fraud involved hundreds of victims and communications; if each victim or each fraudulent misstatement counts as a discrete violation,[2] the Court could, in theory, multiply those statutory amounts by those many violations.  The Commission contends that the Defendants have each committed *two* violations—one for each of the two Securities Act violations (§ 5 and § 17(a)) to which they agreed.  ECF 64 at 1–2.  But it is more common, particularly in this district, for courts to assess "only a single penalty where the violations arise from a single scheme or plan."  *Sec. & Exch. Comm'n v. Lesak*, No. CV 18-1951 (CKK), 2018 WL 11255771, at *4 (D.D.C. Oct. 29, 2018); *S.E.C. v. Garfield Taylor, Inc.*, 134 F. Supp. 3d 107, 110–11 (D.D.C. 2015).  The donation program was a "single scheme or plan"; as such, the Court will think of it as a single violation.

Courts in this district have also looked to a number of factors in determining an appropriate penalty:  "(1) the egregiousness of the defendant's conduct; (2) the degree of scienter; (3) whether the conduct created substantial losses or the risk of substantial losses to other persons; (4) whether

---

[2] In fact, some judges in this district have held that each defrauded victim represents a discrete violation.  *See, e.g., S.E.C. v. Kenton Capital Ltd.*, 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998).

the conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to demonstrated current and future financial condition." *Sec. & Exch. Comm'n v. Milan Grp., Inc*., 124 F. Supp. 3d 21, 25 (D.D.C. 2015).

Rabalais is an easy case; he acted egregiously and with scienter when he designed and executed the donation program, and his actions risked substantial losses to company investors. His conduct recurred over a five-year period, and he has already stipulated, consistent with this Court's previous order, that evidence of his financial condition is irrelevant in these proceedings. ECF 52, ECF 66 at 6, 22. These actions justify the maximum civil penalty of $223,229 for Rabalais, again on the theory that this scheme represents a single violation. 15 U.S.C. § 77t(d)(2)(A)–(C), 17 C.F.R. § 201.1001.

Crystal World and NSEI are tougher calls. These companies are, though perhaps just by a thread, still operating. And although the Commission takes a different view, the record establishes that Rabalais is out of the picture; former Rabalais subordinates Chad Deihl and Alper Ozgit now run the companies. ECF 78 at 5–6. As a result, the second *Milan Group* factor (scienter), cuts somewhat in the companies' favor because they have demonstrated that, despite Deihl's and Ozgit's continued protestations, it was Rabalais who unilaterally refused to register the securities or even consult a lawyer about the need to do so. ECF 81 at 30. To be sure, that Deihl and Ozgit never took concrete action to restrain him cuts against them. But the buck ultimately stopped with Rabalais, and the fraud stemmed almost entirely from his own actions (and inactions). Courts in this District have imputed individual defendants' "wrongful intent" to the corporations they operate, *SEC v. e-Smart Techs., Inc.*, 139 F. Supp. 3d 170, 191 (D.D.C. 2014), but such imputation is not mandatory. *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009) ("Corporations *may* be held liable for specific intent offenses based on the knowledge and intent of their employees.") (emphasis added).

In any event, the Court concludes that the fifth *Milan Group* factor (financial circumstance) cuts against a significant penalty for the companies.  Both argue strenuously that "anything close to" a $1,116,140 penalty "would almost certainly drive the companies into bankruptcy."  ECF 78 at 22, 26.  That would be undesirable, they argue, because the ASM platform is, for all its surrounding controversy, a smart idea—such that, if Deihl and Ozgit are allowed to actually register the securities, the companies could conceivably (and, in Defendants' eyes, likely) make a profit.  Numerous ASM investors attended the public hearing in this case, and the Court can understand their exasperation:  With Crystal World and NSEI insolvent, a paltry fraction of the disgorgement award is the most they could expect from this litigation.  That's little consolation for investors who are still optimistic that they might get their investment back.

The Commission responds that Deihl and Ozgit will likely bankrupt the companies and start afresh; but the Court credits Defendants' arguments to the contrary.  The Commission further posits that, should the companies remain in business, they might once again attempt the donation scheme or something similar.  But the Court finds such actions sufficiently deterred already.  Indeed, for the reasons discussed above, the companies will have to disgorge a substantial amount of the "donations" generated by the scheme.  And Mr. Rabalais' civil penalties serve as ample warning to Deihl and Ozgit personally.  Accordingly, the Court declines to impose the civil penalties sought by the Commission, and instead imposes penalties of $100,000 on each.

## CONCLUSION

Accordingly, it is **ORDERED** that the Motion for Entry of Final Judgment, ECF No. 66, is **GRANTED IN PART**; and it is

**FURTHER ORDERED** that Defendants are ordered to pay the following amounts:

1.  Disgorgement of $1,468,556.93 against all Defendants, jointly and severally.

2.  A Civil Penalty of $223,229 against Defendant Christopher Rabalais and $100,000

against each of Defendant Crystal World and Defendant NSEI.

The Court will enter a Final Judgment contemporaneously with this Opinion.


DATE:  January 28, 2025

_____
CARL J. NICHOLS
United States District Judge